No. 18,254.

SARA MILDRED RADKE, ET AL. *v.* UNION PACIFIC RAILROAD COMPANY.
(334 P. [2d] 1077)

Decided October 27, 1958.
Opinion modified and rehearing denied January 26, 1959.

190

Messrs. GALLIGAN & FOLEY, Messrs. MORELAND, HOS-KINS & KING, Messrs. COLLING, HUGHES, MARTIN & PRINGLE, for plaintiffs in error.

Messrs. KNOWLES & SHAW, Messrs. KRAEGER & SUBLETT,

Messrs. SIDLEY, AUSTIN, BURGESS & SMITH, for defendant in error.

Mr. HERBERT E. MANN, Mr. W. A. E. MITCHELL, amici curiae.

*En Banc.*

MR. JUSTICE SUTTON delivered the opinion of the Court.

PLAINTIFFS in error who were plaintiffs below will be referred to herein as plaintiffs and defendant in error Union Pacific Railroad Company will be referred to as the railroad.

Plaintiffs are the owners of the NE ¼ Section 13, T. 11 N. R. 49 W, Logan County, Colorado. This land was formerly part of Weld County, Colorado. Alleging ownership in fee simple and actual possession of the land they brought suit to remove a cloud from their title, created by a reservation of "the exclusive right to prospect for coal and other minerals" which appeared in the deed given in 1889 by the railroad to the original grantee and plaintiffs' remote predecessor in title, who was an assignee of the original contract purchaser. The record discloses that the land was bought from the railroad under a written contract which provided for conveyance in fee simple, no mention being made therein of any reservations.

Trial was to the court which resulted in favor of the railroad. Motion for new trial was denied and the plaintiffs are here by writ of error.

Most of the evidence in the record consists of various exhibits and the trial court stated that these " * * * have been examined and considered by the Court and received for such probative value as they merit and, for the purpose of clarification of the entire record in this cause, all of such stipulations and exhibits are admitted in evi-

dence in order that an appellate court may have before it the entire record in the event of a review of this case."

Though seven major grounds for reversal are urged by plaintiffs, we deem it necessary to consider only one, which we state to be:

DID THE TRIAL COURT ERR IN CONCLUDING AS A MATTER OF LAW THAT THE EVIDENCE BEFORE IT REQUIRED A FINDING FOR DEFENDANT?

This question is answered in the affirmative.

It appears that during the Nineteenth Century the railroad secured the land in question as part of its Congressional Land Grants. It was to sell the lands to finance its construction. On June 6, 1896, the United States House of Representatives passed a resolution calling for the issuance of patents " * * * to all lands which have been sold by said company to bona fide purchasers * * *." Plaintiffs' land had been sold by the railroad through its trustee to a bona fide purchaser prior to 1896 and was included in the patents granted following the above resolution. The Land Grant Mortgage provided that any tract of land grant lands sold by the railroad "shall be conveyed by the said party of the first part (the railroad) and the said trustees to the purchasers in fee simple." The Sinking Fund Mortgage provided that conveyances executed to land grant purchasers "shall vest in such purchaser or purchasers a perfect title in fee, free and divested of any lien or encumbrance whatsoever * * *."

The exhibits introduced show that in 1887 in the State of Colorado the railroad began to use reservations in various forms similar to the one in question here. They continued to use the form involved here in this state until 1915. Beginning in 1902, however, in many of its deeds it also used a reservation of "oil, coal and other minerals." This continued until 1936.

It thus appears that the railroad itself over a long period of time made a distinction in its deed forms be-

tween "reserved minerals" and the "reserved right to prospect for minerals."

It also appears that the Congress at one time granted the railroad the right to reserve coal and iron; that in the instant case the purchaser took full possession of his land under his contract of purchase and had completely fulfilled his contract obligations with the railroad some ten months before the deed in question was executed. Further, that the railroad's records for many years denominated the reservation in question here as being for "coal." And in 1919, possibly due to its anticipated new tax liability, the railroad changed its own land records on much of its land to show it had reserved coal and "other minerals."

Beginning in 1920 the railroad was assessed and paid taxes on its mineral reservations possibly as a result of court action which resulted in this court's decision in *Union Pacific Railroad Co. v. Hanna* (1923) 73 Colo. 162, 214 Pac. 550. It appears that at least since 1920 these plaintiffs and others similarly situated upon an estimated 23,254.55 acres in Logan County also have been assessed and have paid taxes on the entire value of their lands, including the minerals, because their tax notices did not contain any indication of separate ownership of the minerals or that a third person was paying the taxes thereon. Plaintiffs assert that the other Logan County acreage so taxed was all sold at the same time upon identical contract forms as their land. We note that in the *Hanna* case the railroad urged as a defense against any assessment that there were no known minerals under the lands there involved and therefore the reservation used had only a nominal value.

It was stipulated in plaintiffs' Exhibit F that in each county in Colorado the railroad, where taxable, has been assessed and pays the same amount of tax per acre regardless of the form of reservation which appears in its deeds for land grant lands.

It is admitted that the railroad has never attempted

to lease this land or explore it in any manner for oil or gas or engage in any other mineral development. The court notes, however, that at this date the area is included within what is called the Denver-Julesburg Basin and that considerable oil and gas activity is current in the area.

The evidence before the court included the deed itself with the reservation therein. Other evidence discloses that the railroad, before the discovery of oil and gas in this area, had several times both in Colorado and Wyoming, upon request of those who received deeds with the same or similar reservations, released and quit-claimed a "coal reservation" to clear the titles for the owners.

We need not determine whether this was a recognition by the railroad that it had no legal right to make the reservations—as contended by plaintiffs. Merger, executory contracts, and whether the reservation includes oil and gas as well as other minerals, together with other matters urged by plaintiffs are, for the purpose of this decision, immaterial. This, because we must first decide whether the so-called "reservation" was a mere license, presumably valid when made, or a mineral reservation or exception from the grant. This question being solely one of law, this court is as capable of determining it as was the learned trial court and we are not bound by its conclusions thereon. See: *The McIntosh-Huntington Co. v. Rice* (1899), 13 Colo. App. 393, 58 Pac. 358; *Conklin v. Shaw* (1919), 67 Colo. 169, 185 Pac. 661; *Van Diest v. Towle,* (1947), 116 Colo. 204, 179 P. (2d) 984.

There are many approved ways to reserve or except from a conveyance a part of the estate to be conveyed. Here the wording does not "except coal and other minerals" nor does it read "reserving coal and other minerals," nor does it "except and reserve" the minerals. Here the railroad without first reserving or excepting any minerals or rights thereto provided: *"Reserving,* however, to the said Union Pacific Railway Company

*the exclusive right to prospect* for coal and other minerals within and underlying said land *and to mine for and remove the same if found,* and for this purpose it shall have right of way over and across said lands and space necessary for the conduct of said business thereon, without charge or liability for damage therefor." (Emphasis supplied.)

The railroad's position is that this is a mineral reservation, not a license or lease. Further, that it is technically an exception of a vested interest not subject to loss by non-user. It points to the statement of the trial court that the reservation in dispute, when compared with that made by the Union Trust Company of New York as trustee for these lands, which read "but subject, however, to all reservations and conditions hereinbefore contained," manifests an intention on the part of the railroad *to except* from the grant the title to coal and other minerals. The trial court stating:

"The reservation contained in the deed indicates an intention on the part of the railway company to remove from the premises some portion of the physical estate and not to reserve an incorporeal hereditament to apply the premises conveyed to a right of easment or license, or a mere right-of-way."

*Adams v. Henderson* (1897), 168 U. S. 573, 42 L. Ed. 584, is cited as holding this to be a reservation of a vested interest under "identical" wording. True it is that that case stated this wording was an "* * * encumbrance upon it (the land) arising from the right reserved by the railroad company, for all time * * *" And that the purchasers there could not be "* * * forced to take the land subject to the railroad company's right of way over it for the purpose of prospecting for and mining minerals, which may be taken off, when found." However, the facts of that case when examined, distinguished it from the case before us. It involved an attempt by sellers (who had a contract of purchase from the Union Pacific Railroad) to compel the purchasers to accept a deed to property sub-

ject to this reservation. Clearly the reservation there and here is a burden on the land. It was held that the title not being marketable it could not be forced upon the buyers. The purchase there was made in 1890, completed in 1891, and rescinded in 1891. There it was not necessary to the final determination to say just what kind of an interest was represented by the wording in question. The comments by the United States Supreme Court in the *Adams* case concerning the interest there involved are merely *obiter dicta* and are not binding on this court.

It is also urged by the railroad that "This Court has held that where the language shows the purpose to grant or reserve the profits or benefits of the minerals, the effect is to create a separate fee simple estate in the minerals in place. (That) It is not necessary to incorporate language in the conveyance or reservation saying in so many words that the ownership of the mineral, or that the mineral in place, is being conveyed or reserved. (And that) Expression in terms of the beneficial interest or of the rights which make up the beneficial interest is sufficient, and here the deed reserved the exclusive rights to mine and remove the minerals, without limitation of time." *Simson v. Langholf* (1956), 133 Colo. 208, 293 P. (2d) 302, is cited as authority for this theory. In the *Simson* case an agreement executed in 1927 recited that " * * * has hereby assigned and set over to * * * forty-nine per cent (49%) of all oil and/or gas that may be produced, saved and marketed, from his lands in Jackson County, Colorado, known and described as * * *." There was no oil and gas lease on the property at the time. Later assignor conveyed the property by warranty deed without reserving the minerals. We held that the legal effect of the 1927 instrument was a fee simple conveyance of 49% of all oil and gas in place. We there again recognized the rule of *Mitchell v. Espinosa* (1952), 125 Colo. 267, 243 P. (2d) 412, that oil, gas and other minerals may be severed from the realty and a

separate estate created therein. We also stated that the wording in *Simson* " * * * was legally sufficient to convey an estate in fee simple, *there being no words of limitation* in the conveyance to indicate otherwise. C.R.S. '53, 118-1-7, 118-1-51." (Emphasis supplied.)

*Mitchell* supra involved wording which read: "except óne-half of oil right reserved by Paul·J. Mitchell." In that case the land was later sold by general description at a tax sale without reference to the minerals. We held that the tax sale conferred no rights to one-half of the oil because the reservation had operated to sever the freehold estates.

In *Haymaker v. Windsor* (1927), 81 Colo. 168, 254 Pac. 768, we held that there was a retention of ownership of a vested interest in minerals by the following language, where land was deeded for a reservoir site: "Reserving, however, to the grantor above named the right to occupy the said described property for any use not inconsistent with its use by grantee for reservoir purposes * * *."

There the "reservation" was held to be an "exception" and we quoted 18 R.C.L. 1176, §84, with approval when it stated: "A reservation will be construed as an exception where that is the plain intent and the grantor will retain in himself a fee-simple estate in the portion reserved."

The railroad also cites *Gray-Mellon Oil Co. v. Fairchild* (1927), 219 Ky. 143, 292 S.W. 743; *Caldwell v. Fulton* (1858), 31 Pa. St. 475, 72 Am. Dec. 760; and *Delaware & H. Canal Co. v. Hughes* (1897), 183 Pa. 66, 38 Atl. 568, as authority. In *Gray* the instrument construed granted in part the " * * * exclusive privilege of making, mining and getting oil on or from the lands which they severally own, and such rights of way as may be necessary for the purpose * * *." In *Caldwell* the deed stated in part that it gave " * * * the right, title and privilege of digging and taking away stone-coal * * *." In *Delaware* the court stated:

"If the owner grants to another the right or privilege

of taking coal from his lands, this grant, if not an exclusive one, is not the grant of an interest in land, but of an easement or incorporeal right, which leaves the title to the coal in place remaining in the grantor. But a grant of all the coal, or of the exclusive right to mine the coal, is a sale of the coal in place."

■ ■ An examination of the above cases demonstrates that in each case where the point was pertinent the reservation was a right *in praesenti* to whatever minerals were reserved, excepted or granted, without the grantor or grantee, as the case may be, being required to do any further act. In each case that part of the fee simple estate carved out was created at the instant the instruments were executed. The mineral estate had been severed from the surface estate. Can the same be said of an exclusive right *to prospect* and to remove the minerals *if found* without somewhere in the deed reserving the minerals themselves? We think not. "To prospect for" is a limitation and indicates a foregoing by the railroad of ownership rights in the land. In the instant case the coal and other minerals were not reserved, they were mentioned only as descriptive of that which the railroad was entitled to prospect for. The only reservation was of *a right, which the grantor might never exercise,* to prospect or explore for them. A vested right to the minerals could only arise after they were discovered on the premises. The fact that this was an exclusive right (or license) to prospect does not alter the legal import of the words used *where no present reservation of such minerals was made,* thus making it a reservation or exception of the minerals or subject to the rules governing leaseholds. Compare *Scott v. Laws* (1919), 185 Ky. 440, 215 S.W. 81, 13 A.L.R. 369.

The right reserved here is somewhat similar to the inchoate interests in oil and gas received by a lessee who leases for a term of years and agrees to drill the property. See *Florence Oil & Refining Co. v. Orman* (1903), 19 Colo. App. 79, 73 Pac. 628; also see Chapter 25 entitled

"Vesting of Lessees Interest" in "The Law of Oil and Gas," by Mills-Willingham (Callaghan and Company 1926). In the latter work, beginning at page 71 the authors, supported by ample authorities, discuss this problem and the oil lease abandonment case of *Venture Oil Co. v. Fretts* (1893), 152 Pa. 431, 25 Atl. 732, 17 M. R. 543, 31 W.N.C. 432, and say, *inter alia*:

"We have previously pointed out that the term license is used in two distinct senses by the courts. In the one sense, it is used as synonymous with incorporeal hereditament and profit a prendre. In the other sense, it is used as indicating a temporary privilege to do an act or series of acts upon the land of another without acquiring any estate therein.

"Now in discussing the time of vesting of this incorporeal hereditament, the courts will be found to use the term license in both senses, sometimes in the same case.

"The line of cases which is most difficult to explain is based upon Venture Oil Co. v. Fretts. The court, there used the expression 'The title is inchoate and for the purpose of exploration only until oil is found. If it is not found, no estate vests in the lesee and his title, whatever it is, ends when the unsuccessful search is abandoned. If oil is found, then the right to produce becomes a vested right and the lessee will be protected in exercising it in accordance with the terms and conditions of his contract.'"

The authors then point out the conflicts arising in some jurisdictions in applying the *Venture* case. Concerning these they conclude that:

"* * * It seems, therefore, safe to say that the doctrine of Venture Oil Co. v. Fretts, is only applicable to the 'exclusive right' lease or to those jurisdictions where all leases are construed as 'exclusive right' leases.

"Strictly speaking, it might also be proper to say that the interesse termini in a 'demise, lease and let' instrument, in a jurisdiction where that instrument does not vest an estate until the lessee takes possession, is an

inchoate title only. Otherwise stated, at common law, the lessee, having only an interesse termini before entry made, had an inchoate right which was not consummate until possession."

It is then pointed out that the doctrine of the *Venture* case.

" * * * contemplates a right inchoate until discovery. Discovery is a condition or contingency precedent to its vesting. A somewhat plausible explanation is offered by the Supreme Court of Kansas in this language—'Gas and oil leases are in a class by themselves; they are not strictly leases, as defined and treated in the law of landlord and tenant; they are in the nature of a written license, with a grant conveying the grantor's interest in the gas or oilwell, conditioned that gas or oil be found in paying quantities.'

"In this view we are bound to say one of two things. First, the court chose its terms advisedly and meant just what it said, namely, the lease, whether by deed, or writing not under seal, gives to the lessee a mere privilege to do a series of acts upon the land of the lessor without acquiring any estate therein (i.e., a true license as distinguished from an easement or profit a prendre) with the additional provision that if the lessee shall discover oil and gas he shall thereupon become vested with a right to produce them under the terms and stipulations of the instrument. Second, the alternative is to say that the court used poor diction and meant that the lessee acquired a vested right in the nature of an easement or profit a prendre upon the execution of the lease, but that the lessee acquires no title to the mineral itself until it is reduced to possession or at least discovered. Otherwise stated, the lessee has, upon execution, a vested incorporeal right or estate to seek, ripening into a vested corporeal estate in the mineral upon discovery. It is said that it is his title to the oil and gas as mineral which is inchoate.

"The latter explanation of the doctrine is offered by

many courts, usually when seeking to distinguish the case before them.

"Without expressing approval or disapproval of the doctrine of Venture Oil Co. v. Fretts we are inclined to take it for just what it says. The first explanation, namely that offered by the Kansas Court, appears to be the only logical way to take the doctrine.

"Anomalous as this doctrine may be, it is a fixture in the law of oil and gas and cannot be ignored. * * *."

Oil and gas leases usually provide for royalty payments as well as a fixed term within which to begin the prospecting or drilling and so are dissimilar in other ways from the reservation at bar. The point is that many such leases require some act to be performed by the holder before rights in the minerals vest. Also see 10 *Thompson on Real Property* (1940 Perm. Ed.) 592-4, §5565. The latter authority lists many examples of leases granting the right to explore for oil and gas as being in the nature of revocable licenses before their exercise, rather than estates in land. In other words, a *condition precedent* to the vesting of the right to the minerals is a rather common occurence in oil and gas cases.

*Mills-Willingham* further state (page 64) that in oil and gas lease cases courts are continually raising the question as to whether the lessee's interest is vested. They say there are two classes of jurisdiction:

" * * * One holds that oil and gas are capable of ownership in place, thus laying the ground for a corporeal property subject. The other holds that these minerals are not susceptible of ownership until reduced to actual possession and that property rights pertaining to the mineral are necessarily incorporeal [within present day definitions], because dealing with an incorporeal property subject."

The authors next point out (page 65) that there are three types of leases with regard to the granting clause: (1) a demise of the land for a purpose; (2) a convey-

ance of all the mineral with use of the surface, and (3) the grant of an exclusive right.

A review of the Mills-Willingham discussion discloses a wide divergence in the authorities as to when rights to oil and gas vest under the various types of leases.

Our reference to oil and gas leases is by way of analogy to show that there is no uniformity of opinion in that field of law and the cases therein are only to be considered as guides for the problem at hand since in none of the mining authorities or cases have we found a case exactly in point with the issue here presented.

Perhaps the case most nearly in point is one cited by the railroad, *States Oil Corporation v. Ward* (1922 Texas), 236 S. W. 446. In that case the question was whether a grantor mining company, by the instrument relied upon by the appellants, reserved the title to the minerals or simply reserved the right to prospect for them and to become the owners thereof after they were extracted from the lands. The warranty deed recited in pertinent part:

"But it is expressly agreed and stipulated that this deed is made subject to the following rights of the said Mining Company, each and all of which rights are hereby reserved and are not to pass by this deed. 1. * * * reserves the right at all times hereafter to enter upon the land hereby conveyed and prospect for and make surveys at will on any part of it for coal, minerals, stone, or any other valuable deposit, and to open up on said land and operate with machinery, * * * mines, borings, and quarries, and the coal, minerals, stone, or other valuable deposits found in and taken from all such mines; borings, and quarries, shall be the property of said [grantor] * * *."

Under the quoted wording the court in *States* held that:

" * * * the reservations contained in the deed from * * * to * * * retained in that company the present legal

title to the coal, minerals, stone, and other valuable deposits, * * *."

The wording there and here while quite similar in some respects, in *States* it is clearly qualified by the express words used as a preface to the rights reserved. This is of course different from the wording involved here where no present legal title was reserved—only a future right to prospect for minerals and to remove them if found. In the *States* case a present reservation is clearly intended in the first sentence of the quoted conveyance which the court held to create a present interest in the minerals, although the right to prospect for and to remove the minerals is expressed for the future. If that decision be considered in conflict with our views as herein expressed we chose not to follow it.

The wording at issue here was discussed in *Union Pac. R. R. v. Hanna,* supra, where one of this railroad's deeds is set out in pertinent part, the wording used being:

"Excepting and reserving:

"First: All oil, coal and other minerals within or underlying said lands;

"Second: The exclusive right to prospect in and upon said land for oil, coal and other minerals therein, * * *, and to mine for and remove from said land all oil, coal and other minerals which may be found thereon by any one."

Respecting the deed terminology quoted in the *Hanna* case this court quoted with approval from *Northern Pacific Ry. Co. v Musselshell County* (1917), 54 Mont. 96, 169 Pac. 53, 58, where the Montana court in considering taxability, *vel non* said:

"The reservation in question is dual: a corporeal hereditament, as to the coal and iron; an incorporeal hereditament, as to the right to enter the lands conveyed, to explore for coal * * *, and to extract the same when found, using so much of the surface as may be necessary."

*Hanna* being concerned with only the taxability of the reservation, this court was constrained to state that only in a proper case with appropriate parties present would it be proper to decide the relative rights and liabilities as between the owners of the separate estates. Such a case is now before us.

 In Colorado "Every estate in lands which shall be granted, conveyed or devised to one, although other words heretofore necessary to transfer an estate of inheritance be not added, shall be deemed a fee simple estate of inheritance, *if a less estate be not limited by express words,* or do (sic) not appear to be granted, devised or conveyed by operation of law." C.R.S. '53, 118-1-7. (Emphasis supplied.) This statute comes down to us from territorial days. (R.S. 1868, page 107, §7.)

In *Saxmann v. Christmann* (1938), 52 Ariz. 149, 79 P. (2d) 520, citing 17 R.C.L. 570, §83, the court in discussing the distinction between a lease and a license said:

"A clearly defined distinction is drawn by the authorities between agreements which create a lease of the land for mineral purposes and those which are simply a license giving to the licensee authority to enter and operate for minerals. While under a lease an interest or estate in the land itself is created, under a license a licensee has no interest or estate in the land itself, but only in the proceeds, not as realty, but as personal property, and his possession is the possession of the owner. In general, a contract simply giving a right to take ore from a mine, no interest or estate being granted, confers a mere license, and the licensee acquires no right to the ore until he separates it from the freehold."

Vol. 2 Bouvier's Law Dictionary, Third Revision (1914) defines an incorporeal hereditament as "Anything, the subject of property, which is inheritable and not tangible or visible." * * * "A right issuing out of a thing corporate (whether real or personal) or concerning or annexed to or exercisable within the same." Among

the authorities cited is *Wyatt v. Irrigation Co.* (1893), 18 Colo. 298, 33 Pac. 144.

Bouvier's Law Dictionary further states that "According to Blackstone, there are ten kinds of incorporeal hereditaments: viz., advowsons, tithes, commons, ways, offices, dignities, franchises, corodies, annuities, and rents. 2 Com. 20. In the United States there are no advowsons, tithes, dignities, nor corodies, commons are rare, offices rare or unknown, and annuities have no necessary connection with land. 3 Kent 402, 454. And there are other incorporeal hereditaments not included in this list, as remainders and reversions dependent on a particular estate of freehold, easements of light, air, etc., and equities of redemption; 1 Washb. R.P. *11."

An incorporeal hereditment is defined in 73 C.J.S. 168, §7, as:

"An incorporeal hereditament is a right issuing out of a thing corporate, whether real or personal, or concerning, or annexed to, or exercisable within, it. It is not of a sensation, can neither be seen nor handled, is a creature of the mind and can exist only in contemplation. * * * An incorporeal hereditament is not the land or thing corporeal, but is something merely collateral thereto, an invisible and intangible right; and it must not be confounded with the profit or thing of a corporeal nature which the right may produce."

We believe that the use of the term "incorporeal hereditament" to describe the reservation in the *Hanna* and *Northern Pacific Ry.* cases was unfortunate. Other decisions have used it to describe the grant of a right to remove minerals in common with the grantor or owner of the fee. See *United States v. 12.75 Acres of Land* (1951), (D.C. E.D. Tenn.), 95 Fed. Supp. 998, and *Stanton v. T. L. Herbert & Sons* (Tenn. 1919), 211 S.W. 353.

Apparently the courts, with their inherent powers to adopt to new situations, have enlarged the original common law definitions of incorporeal hereditaments to

include new types of rights which are now included within the definition contained in 73 C.J.S. 168, §7 supra. Though this be true, we cannot conclude that a license amounts to or is as much as an incorporeal hereditament. It is something separate and distinct as more fully hereinafter shown.

A license in respect to real property is defined in 33 Am. Jur. 398, §91 as "* * * a personal and unassignable, and ordinarily revocable, privilege conferred either in writing or by parol, to do one or more acts on land without possessing any interest therein." And in 53 C.J.S. 806, §79, as "* * * an authority to do an act on the land of another without possessing any estate in the land, and is to be distinguished from a grant or demise creating some interest in the property."

Licenses or privileges to enter and remove minerals are distinguishable from agreements which create a lease of the land for mineral purposes. Some courts have construed instruments granting the right to mine ore or other minerals as constituting a lease, rather than a mere license. See 36 Am. Jur. 309, §40 and authorities cited thereunder. Under a lease an interest or estate in the land itself it created, which is not true of a mere license. The authorities seem agreed that whether the words used create a lease or a license depends upon the agreement itself. 36 Am. Jur. 309, §40, supra. We thus are free to determine whether the words used in the instant case were apt and appropriate to create a mineral interest in the land.

A license is merely a permit or privilege to do what otherwise would be unlawful. While it has been regarded, for some purposes, as a valuable property right, strictly speaking it is not property or a property right, nor does it create a vested right. *Palmetto Fire Ins. Co. v. Beha* (1926), D.C. N.Y., 13 Fed. 2d 500; also see 53 C.J.S. 449, §2. A license to use premises in a certain manner may result in a right similar to a grant because on the exercise of the right an interest attaches

to the premises described in the license. See *Saxe v. Street Comr's of Boston* (1940), 307 Mass. 495, 30 N.E. 2d 380, 131 A.L.R. 1336.

■ No formal language is necessary to create a license as long as the proper intent appears, and in the absence of statute it may be created by parol. No consideration is required unless the license amounts to an executory agreement. It is ordinarily available only to the licensee to whom it is granted. Ordinarily a license is not assignable by the licensee without the consent of the licensor, and an attempted unauthorized assignment terminates the privilege. An executed license, or one coupled with an interest, however, is sometimes assignable. The period of a license agreement may be definite or *indefinite,* depending on the terms of the agreement. And, notice of termination by the licensee is sometimes required. A bare license ordinarily can be revoked at the pleasure of a licensor, regardless of how long the use has been permitted, but a license which confers an enforceable right, rather than a mere personal privilege, is not so revocable. Revocation may be either express or implied, and generally results from a sale or other disposition of the land whereby rights inconsistent with the privilege conferred by the license are granted. See 53 C.J.S. 807-820, Sections 80, 84 (c), 86, 87, 89 and 93, and cases cited thereunder, for a discussion of the above principles.

A license is revoked *ipso facto* by the licensor's conveyance of the land *(Omaha & Grant Smelting & Refining Co. v. Tabor* [1889], 13 Colo. 41, 21 Pac. 925, 5 L.R.A. 236, 16 Am. St. 185) or by his doing any act which is inconsistent with, or prevents the exercise of, the license. 2 Thompson on Real Property, Perm. Ed. 406, et seq., §717.

As to when a license is irrevocable, 2 Thompson on Real Property 409, Sections 718 and 719, compares a license coupled with a grant (which is *usually* not revocable) with a license coupled with an interest (which

is not revocable). Suffice it to say here that we do not deem the right to prospect for minerals and to remove same if found to be either a grant of the minerals or the grant of a license coupled with an interest. We deem it to be a license revocable until exercised, and once exercised to vest the irrevocable right in the license holder to continue his prospecting and to remove as personalty all minerals found. We further conclude that the license in the instant case is not within either the dictionary definition of an incorporeal hereditament nor that of other authorities; therefore, insofar as *Hanna,* supra, conflicts with the views expressed herein, in describing the type of interest created by the reservation, it is overruled.

Our conclusion is not to be taken to mean that there cannot be an entire severance of the surface and mineral estates (see 36 Am. Jur. 300, §29 for a discussion of this general rule), such as we recognized in *Mitchell v. Espinosa,* supra, but the severance must be by clear and distinct wording in the conveyance. Until such a severance occurs the ownership of the surface carries with it the ownership of the underlying minerals. *Bogart et al v. Amanda Consolidated Gold Mining Co.* (1903), 32 Colo. 32, 74 Pac. 882. Thus *Calvat v. Juhan* (1949), 119 Colo. 561, 566, 206 P. (2d) 600, relied upon by the railroad, is not in point as a severance had occurred in that case.

The railroad urges that this reservation was without limitation as to time, therefore a vesting occurred when it was created. This would be true if a severance of the mineral estate in fact had occurred, but it did not, so the time factor cannot be of aid.

It also is urged that it was the intention of the railroad to reserve the minerals, that the wording in question is ambiguous and therefore intention is the governing factor. It is well known that the intention of the parties to a conveyance is open to interpretation only when the words used are ambiguous. *Brown v. Kirk*

(1953), 127 Colo. 453, 257 P. (2d) 1045; *Simson v. Langholf*, supra; 26 C.J.S. 1009, §140. The words used here, reserving the right to prospect and to remove minerals if found, are not ambiguous. And were they so, they would have to be construed most strongly against the grantor and in favor of the grantee. *Wyatt v. Irrigation Co.*, supra. Moreover a reservation is construed more strictly than a grant. Thompson on Real Property, Vol. 6, §3486, supra.

We point out that if intention were to govern in this case, the burden of the railroad would be heavy indeed. We observe that The Congress gave it only the right to reserve coal and iron; the railroad's own records show that for many years this was labeled by it only as a "coal" reservation; it contracted with plaintiff's predecessors in title to convey a fee simple title; it conveyed its "coal" reservations to those of its purchasers who protested at the railroad's attempt to reserve any minerals; and, in the many other forms of reservations used by the railroad (a long list thereof being in evidence), it had many full, proper and complete reservations of mineral rights.

The fact that the railroad has paid taxes on what it thought, or hoped, was a mineral reservation, is of no consequence since it had reserved only a license. It was a volunteer and has no equities entitled to protection under the facts before us. Possession was at all times exclusive in the plaintiffs and their predecessors in title and the statute (C.R.S. '53, 118-7-8) cannot apply to create a fee under color of title and payment of taxes for the statutory period in one out of possession.

This brings us to the question of the purpose of plaintiffs' suit. It was not to reform the deed. They claim nothing from the defendant railroad. They sought only to remove the cloud from their title caused by the unused license appearing of record. They are not to be charged with laches under the circumstances revealed by this record. *Nichols v. McIntosh* (1893), 19 Colo. 22,

28, 34 Pac. 278. The applicable rule is well stated in 30 C.J.S., Equity, 538, §116 c, as:

"One in peaceful possession of property which is the subject of adverse claims is not chargeable with laches for delay in instituting suit in equity, to enforce or protect his right."

■ We hold that a right to prospect for and to remove minerals if found, as used here, is not a reservation of an estate in the real property involved, but a mere license, subject to revocation before its exercise by the owner of the fee simple estate. We conclude that the railroad's right as a licensee to enter upon this land to prospect for minerals, not having been exercised prior to the conveyance by its grantee, it was thereby revoked and the cloud on plaintiffs' title resulting therefrom should be removed.

The judgment is reversed with directions to enter a decree in favor of the plaintiffs.

On petition for rehearing the opinion has been modified and as modified is adhered to and petition for rehearing denied.

MR. JUSTICE MOORE formerly not participating now dissents.

MR. JUSTICE DOYLE does not participate.

MR. JUSTICE MOORE dissenting.

Although I did not participate in the consideration of this case at the time the original opinion was announced I have elected to do so upon consideration of the petition for rehearing.

The majority opinion expresses a theory that does violence to settled principles of real property law. A reservation entirely clear in its expression is contained in a deed conveying land. That reservation expressed in detail the essentials of a mineral estate, to-wit: The exclusive right to prospect for minerals, to mine and remove the same if found and to use the surface for

those purposes without limit as to time or any other condition, burden or qualification.

I cannot agree that such an estate was a mere license subject to revocation in any manner by the grantee or his successors in interest. In my opinion the reservation in this case created an outstanding mineral estate vested in the Defendant in Error under the authority of the cases from many jurisdictions including the United States Supreme Court and the numerous other authorities reviewed in the Petition for Rehearing and previously in the Answer Brief.

Speaking of an identical reservation, the United States Supreme Court stated that the deed reserved "an exclusive right in the Union Pacific Railroad Company to mine, under said land, for coal and other minerals, and to remove the same"; that it was a "right of the railroad company for all time"; and that the grantee could not compel the railroad "to surrender or waive this reservation." *Adams v. Henderson,* 168 U.S. 573, 578, 580. I agree with that ruling made over sixty years ago. That the language used is not "Obiter Dicta," but essential to the decision of the Supreme Court, is evident to me from the fact that if the reservation had created a license, revocable at will by the grantee or his successors, it could not have been, as the Supreme Court held, an encumbrance on the grantee's title.

6 Thompson on Real Property (1940) Section 3462 states: "A reservation of an exclusive right of mining coal or ores from the granted land clearly operates as an exception of the mines from the grant. Minerals, coals, and ores, excepted from a grant remain in the grantor as before the grant." See also 1 Thompson on Real Property Sections 97 and 98. Jones on Easements (1898) Section 57, similarly states the rule, "a grant of exclusive right to take all the coal in certain land is in effect a sale of the coal itself. It is not an incorporeal right, but a right to part of the land itself." 36 Am. Jur. 323, "Mines and Minerals," notes that, "it is only when

the right to mine the minerals is *not exclusive* that it may be classed as an easement in the nature of a license. Mills-Willingham Law of Oil and Gas, which is quoted in the majority opinion in another connection, describes the legal effects of a provision such as the present one as follows:

"If, therefore, the instrument were an unconditional grant of the exclusive right without any burdens or qualifications, i.e., without provision for royalty, it would certainly vest the estate in the grantee upon its execution and delivery. In Jurisdiction(s) where oil and gas are capable of ownership such a grant of an exclusive right would operate to transfer not an incorporeal hereditament but a corporeal one."

The opinion of the court cites no case either holding or stating in obiter dicta that a reservation or grant of an exclusive and unlimited right to mine and remove minerals results in a mere license. Such an instrument severs the mineral rights from the surface estate. *Benson v. The Miners' Bank,* 20 Pa. St. 370; *Caldwell v. Fulton,* 31 Pa. St. 475, 72 Am. Dec. 760; *Delaware & H. Canal Co. v. Hughes,* 38 Atl. 568; *Lee v. Bumgardner,* 10 S. E. 3 (Va.); *List v. Cotts,* 4 W. Va. 543; *Jamison Coal & Coke Co. v. Carnegie Natural Gas Co.,* 87 S. E. 451; *Gray-Mellon Oil Co. v. Fairchild,* 292 S. W. 743; *Stanton v. T. L. Herbert & Sons,* 211 S. W. 353.

The fact that the owner of the exclusive right to mine and remove minerals also has the exclusive right to prospect for them does not detract from or qualify his ownership rights. *States Oil Corporation v. Ward,* 236 S. W. 446, (Texas); *Woodside et al v. Ciceroni,* 93 Fed. 1 CCA 9 (1899); *Scott v. Laws,* 215 S. W. 81 (Kentucky). Indeed, one of the attributes and rights that goes with ownership of minerals, even if not expressly stated, is the right to prospect for the minerals. *Simpson v. Langholf,* 133 Colo. 208, 298 P. (2d) 302. We have held that a deed may reserve or grant the mineral title even though it does not specifically refer to the minerals in

place. *Haymaker v. Windsor Reservoir & Canal Co.,* 81 Colo. 168, 254 Pac. 768; *Simpson v. Langholf,* supra; *Corlett v. Cox,* (decided December 15, 1958).

In my opinion the district court was correct in holding that the deed here reserved the mineral estate in the grantor. I would follow the previous decisions of this court, of the United States Supreme Court and of other states rather than overruling or rejecting them.

For these reasons I cannot concur in the majority opinion.