COLORADO COURT OF APPEALS                               **2017COA134**

Court of Appeals No. 16CA1723
Board of Assessment Appeals, State of Colorado Case Nos. 68337, 68338,
68339 & 68340

HDH Partnership; Lawrence Ausherman; Mark L. Ish; Herb Marchman;
Hondros Family Real Estate, LLC; and Teresa M. Mull Revocable Trust,

Petitioners-Appellants,

v.

Hinsdale County Board of Equalization,

Respondent-Appellee

and

Board of Assessment Appeals, State of Colorado,

Appellee.

ORDER REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division IV
Opinion by JUDGE GRAHAM
Booras and Dunn, JJ., concur

Announced October 19, 2017

Hoskin Farina & Kampf, P.C., Michael J. Russel, Andrew H. Teske, Karoline M.
Henning, Grand Junction, Colorado, for Petitioners-Appellants

Schumacher & O'Loughlin, LLC, Michael P. O'Loughlin, Gunnison, Colorado,
for Respondent-Appellee

Cynthia H. Coffman, Attorney General, Krista Maher, Assistant Attorney
General, Denver, Colorado, for Appellee

¶ 1    In this case we are tasked with determining whether owners of fishing and hunting memberships, HDH Partnership, Lawrence Ausherman, Mark L. Ish, Herb Marchman, Hondros Family Real Estate, LLC, and Teresa M. Mull Revocable Trust, may be taxed for the parcels of real estate allocated to them in their membership agreements.

¶ 2    The parcels are part of a larger tract of land used as a hunting and fishing club in southwestern Colorado.  Membership in the club is granted to those who hold a deed to one of the parcels which collectively comprise the club grounds.  Members cannot make improvements on their parcels or exclude other club members.  Instead, the club retains control over the grounds and grants all members equal access, regardless of the parcel to which they hold title.  A member's rights to access the grounds can be revoked if he or she owes money or violates club rules.

¶ 3    On these facts, we conclude that the club is the true property owner because it enjoys the most significant incidents of ownership while members effectively have a license to use club grounds, notwithstanding that they hold bare legal title to the parcels.

Therefore, the club, not the members should bear the real property tax burden.

## I. Background

### A. The Lake Fork Hunting and Fishing Club

¶ 4 In 1979, the Lake Fork Hunting and Fishing Club (the Club) was formed. A declaration transferred 1400 acres of land to the Club, divided into twenty-nine parcels, known as "Ranches." Except for a single "Floating Membership" that is not tied to a Ranch, the only way to obtain membership in the Club is to hold title to part of a Ranch. Membership cannot be "sold, assigned or transferred, voluntarily or by will or by operation of law." Instead, "[w]henever a member . . . cease[s] to own the interest in the real property which entitles him to such membership . . . such member shall automatically be dropped from the membership rolls of the Club and the membership certificate [is transferred] to the new ranch owner." In other words, club membership cannot be severed from the deed, but instead follows record title to a Ranch.

¶ 5 The Club reserves the following rights:

- "exclusive hunting and fishing rights and privileges including all rights of ingress and egress upon and across the entire property, including all Ranches";
- "exclusive right to construct and maintain over, across and upon each Ranch . . . utilities, roads, lakes, ditches, bridges and fences";
- "exclusive right to pasture livestock on the entire property, including each individual Ranch";
- "the right to impound, store, and divert the waters of the Lake Fork of the Gunnison river over, across and upon each Ranch"; and
- the rights to "easements and rights of way incident to and necessary to maintain . . . the existing skeet and trap field, the existing golf driving range and the existing airport runway."

Members are prohibited from

- subdividing the Ranches;
- building within one hundred feet of the river;
- placing trailers or mobile homes on the Ranches; or

3

- conducting any mining or drilling activities.

Initially, members were barred from building more than three residences on any Ranch, but, in 1999, the declaration was amended to prohibit the construction of *any* residence on a Ranch.

¶ 6    The Club's bylaws limit the number of guests a member may bring to the Club for hunting or fishing and the number of days an individual guest may hunt or fish.  Members must register themselves and their guests when using Club grounds, and their hunting and fishing activities are subject to detailed Club regulations.  The Club is entitled to all revenues from fees charged for hunting, fishing, shooting, and other activities on the grounds.

¶ 7    Only "members in good standing" are permitted to access Club grounds, which are defined as "all property owned by Lake Fork Hunting and Fishing Club including all ranches by virtue of the ownership of which persons are entitled to membership in the Lake Fork Hunting and Fishing Club."  Members who have unpaid assessments or other outstanding fees "shall not be entitled to the privileges of the Club."  And the Board of Governors may "censure[], fine[], or have all privileges suspended . . . for violation of the Declaration . . . , By-Laws, Rules or Regulations . . . or for any

4

conduct which in the opinion of the Board, is improper or prejudicial to the welfare of or reputation of the Club."

B.    Procedural History

¶ 8    Each of the petitioners in this case holds membership in the Club by virtue of a deed conferring record title to a Ranch or part of a Ranch. They initiated this action after they disagreed with the Hinsdale County Assessor's 2015 assessment of those parcels. They argued that the Assessor should not have assessed property taxes to them individually because, although they are the record title holders, they do not actually enjoy traditional incidents of ownership, which are instead retained by the Club. The Club, they said, is the true property owner and therefore it should have received the property tax assessment. Petitioners also argued that the Assessor failed to account for the personal property value of the Ranch deeds. The value of the deeds, they claimed, was not in the land but in the club membership that the deed granted — membership which constitutes a personal property interest not subject to real property taxation.

¶ 9    The Hinsdale County Board of Equalization (BOE) agreed with the Assessor that petitioners were the parcel owners and affirmed

5

the Assessor's valuation. Petitioners appealed to the Board of Assessment Appeals (BAA), which agreed with the BOE and affirmed its decision. Petitioners then filed this appeal.

¶ 10     Because we agree with petitioners that the Club is the true owner of the parcels, we conclude that the BAA erred as a matter of law in assessing real property taxes to petitioners. We also conclude that the BAA erred in affirming the Assessor's valuation, because it was based on the personal property value of petitioners' licenses to use Club grounds, rather than the value of the parcels as real property. Accordingly, we reverse the BAA's order and remand for further proceedings consistent with this opinion.

II.     To Whom Should the Real Property Taxes be Assessed?

¶ 11     We must first answer the following question: Who is the true owner of the Ranches who should be assessed taxes for them? We agree with petitioners that bare legal title is not determinative, and, instead, we must look beyond the legal form to the substance of the parties' respective rights. We also agree that, based on petitioners' and the Club's respective rights, petitioners hold mere licenses to use Club grounds, while the Club retains the most significant

6

traditional incidents of ownership.  Therefore, we conclude that the Club, as the true owner, should have been assessed the taxes.

## A.    Standard of Review

¶ 12    We review decisions of the BAA as a mixed question of fact and law.  *See Cantina Grill, JV v. City & Cty. of Denver Bd. of Equalization*, 2015 CO 15, ¶ 15.  We defer to the BAA's factual findings unless they are unsupported by competent evidence in the record, but we interpret the tax statutes de novo, and apply those interpretations to the facts to reach our own legal conclusions. *Roaring Fork Club, LLC v. Pitkin Cty. Bd. of Equalization*, 2013 COA 167, ¶ 21; *see also* §§ 24-4-106(7), (11), 39-8-108(2), C.R.S. 2017; *Cantina Grill*, ¶ 15.

¶ 13    Whether something is "an interest in property that can be valued and is subject to property tax" is a question of law.  *Roaring Fork*, ¶ 26.

¶ 14    When interpreting statutes, we give the words their ordinary and common meanings and interpret the provisions as a whole, giving effect to all parts.  *Bd. of Cty. Comm'rs v. Vail Assocs., Inc.*, 19 P.3d 1263, 1273 (Colo. 2001).

7

## B. We Must Look Beyond Bare Legal Title to Determine Ownership

¶ 15     The BOE insists that the Assessor was obligated to assess taxes to the record title holders (petitioners) and that we may not look beyond bare legal title when determining ownership for tax purposes.[1]  Petitioners disagree, arguing that the law permits us to look beyond the title to the substance of the parties' rights when determining ownership.  We agree with petitioners.  Their position finds support in statute and case law.

### 1. Record Title is Not Conclusive Under Colorado's Tax Statutes

¶ 16     First, reading the tax statutes as a whole, we conclude that record title is not conclusive evidence of property ownership.  It is true that assessors are directed to ascertain real property ownership "from the records of the county clerk and recorder."
§ 39-5-102(1), C.R.S. 2017.  But those records are merely "prima facie evidence of all things appearing therein."  § 39-1-115, C.R.S. 2017.  Prima facie means "[a]t first sight; on first appearance but subject to further evidence or information."  Black's Law Dictionary

---

[1] The BAA acknowledges that we may look past the form to the substance of the parties' rights but contends that petitioners retain sufficient rights such that they are the true parcel owners.

1382 (10th ed. 2014). And section 39-5-122(2), C.R.S. 2017, provides that "[i]f any person is of the opinion that . . . property has been erroneously assessed to such person, he or she may appear before the assessor and object." Therefore, while record title is evidence of property ownership, it merely creates a rebuttable presumption, not a conclusive determination.

¶ 17    We are also unpersuaded that section 39-5-104, C.R.S. 2017, required the Assessor to tax the individual deed holders. "Each tract or parcel of land . . . shall be separately appraised and valued, except when two or more adjoining tracts, parcels, or lots are owned by the same person, in which case the same may be appraised and valued either separately or collectively." § 39-5-104. The BOE argues that this requirement for individual parcel valuation required the Assessor to assess taxes to the individual record title holders. While this provision requires valuation of individual owners' parcels, it is silent on *how* ownership is determined. Thus, it does not affect our conclusion that the tax statutes permit us to look beyond bare legal title.

9

## 2. Case Law Supports Looking Past Bare Legal Title to Determine Ownership for Tax Purposes

¶ 18 Furthermore, case law illustrates that property ownership is not necessarily determined by record title. Instead, we must look beyond "form[s] and labels" to determine "real ownership." *Mesa Verde Co. v. Bd. of Cty. Comm'rs*, 178 Colo. 49, 54, 495 P.2d 229, 232 (1972); *Gunnison Cty. v. Bd. of Assessment Appeals*, 693 P.2d 400, 404 (Colo. App. 1984) ("Record title alone . . . is not determinative.").

> "[T]axation is not so much concerned with the refinements of title as it is with actual command over the property taxed . . . ." In a number of cases, the Court has refused to permit the transfer of formal legal title to shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred. In applying this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed. The Court has never regarded "the simple expedient of drawing up papers," as controlling for tax purposes when the objective economic realities are to the contrary. "In the field of taxation, administrators of the laws and the courts are concerned with substance and realities, and formal written documents are not rigidly binding."

*City of Golden v. Aramark Educ. Servs., LLC*, 2013 COA 45, ¶ 31
(alteration in original) (quoting *Frank Lyon Co. v. United States*, 435
U.S. 561, 572-73 (1978)).

¶ 19     This principle has been applied to tax cases in Colorado in the
following situations:

- evaluating disputes over whether property is taxable, *see
  Cantina Grill*, ¶¶ 5-73 (looking past form to determine
  that Denver International Airport concessionaires'
  possessory property interests were not tax exempt even
  though city held legal title); *Mesa Verde*, 178 Colo. at 53-
  57, 495 P.2d at 231-33 (looking beyond bare legal title to
  determine that concessionaire on national park property
  owned improvements thereon); *Gunnison Cty.*, 693 P.2d
  at 404 (applying substance over form doctrine to
  determine that jail which county sold and leased back
  from a private entity was tax exempt county property);

- deciding if a contract conveyed a real property interest,
  *see Vill. at Treehouse, Inc. v. Prop. Tax Adm'r*, 2014 COA
  6, ¶¶ 8-30 (holding that assignment of rights to develop
  condominium units constituted taxable real property

11

rights, notwithstanding that transferor retained rights in the common elements); *Bernhardt v. Hemphill*, 878 P.2d 107, 112-13 (Colo. App. 1994) (holding that time share contract did not create real property interest);

- analyzing whether a contract created tax exempt or taxable sales, *cf. Aramark*, ¶¶ 31-35 (explaining that substance over form doctrine supported argument that contract created retail sales but ultimately deciding case based on presumption against tax exemption) (citing *Frank Lyon*, 435 U.S. at 572-73); and

- determining whether a golf club membership, nominally a personal property interest, was actually taxable as real property, *Roaring Fork*, ¶¶ 31-46 (holding that memberships were merely licenses, not leaseholds taxable as real property).

¶ 20    Nothing in the law suggests that this doctrine cannot also be applied to the question of who is the true owner of real property and should therefore be assessed taxes.  In fact, there is strong support for applying the doctrine here.  *See Frank Lyon*, 435 U.S. at 573; *Mesa Verde*, 178 Colo. at 57, 495 P.2d at 233 ("[W]here a party has

the right to possession, use, enjoyment, and profits of the property, that party should not be permitted to use the bare legal title . . . to avoid his fair and just share of state taxation."); *Gunnison Cty.*, 693 P.2d at 404 ("The nature of a transaction is not controlled by its legal characterization; rather, it is the intention of the parties which determines the essence of the transaction, and the facts of each case demonstrate the parties' intention.").

## C. Applying the Substance Over Form Doctrine Reveals That the Club is the True Owner

¶ 21 Having concluded that we may look past bare legal title to determine ownership, we must now examine the substance of petitioners' and the Club's rights to decide who is the true owner of the real property.  Because the Club has a high degree of control over the grounds, and petitioners may only use the grounds equally with other club members and subject to the Club's control and regulation, we conclude that the Club is the true owner while petitioners' rights are akin to a mere license.

¶ 22 "Property rights in a physical thing have been described as the rights 'to possess, use and dispose of it.'" *Loretto v. Teleprompter Manhatten CATV Corp.*, 458 U.S. 419, 435 (1982) (quoting *United*

13

*States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945)). The right to possess property connotes the right to control it. *See Cantina Grill*, ¶ 1 n.1 (Possessory interest is defined as "[t]he present right to control property, including the right to exclude others"[;] "a physical relation to the land of a kind which gives a certain degree of physical control over the land, and an intent so to exercise such control as to exclude other members of society in general from any present occupation of the land." (first quoting Black's Law Dictionary 1353 (10th ed. 2014); then quoting Restatement (First) of Property § 7 (1936))). The power "to exclude others . . . has 'traditionally been considered one of the most treasured strands in an owner's bundle of property rights.'" *Aspen Springs Metro. Dist. v. Keno*, 2015 COA 97, ¶ 9 (quoting *Loretto*, 458 U.S. at 435). Other real property ownership rights include the right to develop the property, *see Vill. at Treehouse*, ¶ 22, and the right to income from the property, *McDonald v. McDonald*, 150 Colo. 492, 494, 374 P.2d 690, 691 (1962); *see also Mesa Verde*, 178 Colo. at 57, 495 P.2d at 233.

¶ 23    By contrast, "[a] license is a personal privilege to do some act or series of acts upon the land of another not involving possession

of an estate or interest therein." *Roaring Fork*, ¶ 41 (quoting *Welsch v. Smith*, 113 P.3d 1284, 1289 (Colo. App. 2005)).

¶ 24     In applying these rules to the facts here, *Roaring Fork* is instructive. In that case, a division of this court concluded that a golf club membership was not a leasehold but a license. *Id.* at ¶¶ 36-37. The club's members had "a personal privilege to perform any of a series of acts on the club's property, including playing golf, fishing, dining, or working out at the fitness facility." *Id.* at ¶ 41. But, members were not entitled to "possession of the property . . . [or] exclusive use or occupation of it," could not receive rents or profits from the club's property, and could not "exclude any others from the club's property who would use it in the same way." *Id.* at ¶¶ 37, 40 (citation omitted). Furthermore, "memberships can be revoked for . . . nonpayment of dues or violation of the club's rules and regulations." *Id.* at ¶ 41.

¶ 25     Although the memberships here are conveyed by deed, the rights they convey are strikingly similar to those in *Roaring Fork*. Members do not have possessory rights to the parcels for which they hold record title; they can only access them equally with other club members. They have no power to exclude other club members

15

from the parcels to which they hold title and are limited in the number of guests they may bring onto the grounds. Members cannot profit from mining, drilling, or pasturing livestock on their parcels and are not entitled to revenues collected by the Club from use of the property. Members also lack control over improvements to the property. And members' rights to access Club grounds may be revoked if they do not pay their assessments and fees or if they violate Club rules.

¶ 26 Meanwhile, the Club enjoys most of the traditional benefits of real property ownership, including the rights to exclude nonmembers or members not in good standing, to erect or remove improvements, to control the river and its waters, and to profit from the land by pasturing livestock, conducting mining or drilling activities, and charging fees to members. Given the extent of the Club's control over the property, we conclude that, while the members hold bare legal title to the parcels, the Club is the true owner. *See Frank Lyon*, 435 U.S. at 573; *Mesa Verde*, 178 Colo. at 57, 495 P.2d at 233 ("[W]here all the evidence indicate[d] that the most significant incidents of ownership [were] possessed by [a private party], it would be an especially unjust result to allow [that

16

party] to escape state taxation."); *Gunnison Cty.*, 693 P.2d at 404 (The county "retained sufficient control of the property to render it tax exempt" where it "occupie[d] and control[led] the property, control[led] construction and improvements of the property, [and] maintain[ed] and insure[d] the property.").

¶ 27    Accordingly, we agree with petitioners that the BAA erred as a matter of law in holding that petitioners were the real property owners.

### D.    Appellees' Other Arguments Regarding Ownership Are Unavailing

¶ 28    We find the BOE's and BAA's remaining arguments on this issue unpersuasive for the following reasons.

#### 1.    Petitioners Benefit From Holding Restrictive Deeds

¶ 29    The BOE argues that the substance over form doctrine is inapplicable here because "[petitioners'] statements throughout their Opening Brief make it sound like the Club's owners have no rights or privileges by having an ownership interest in a [Ranch] . . . [but] the owners enjoy many outdoor recreational benefits by owning a parcel."  Relatedly, the BOE and BAA argue that the limitations on petitioners' property rights are merely restrictive

covenants from which they benefit through the preservation of the Club as an undeveloped hunting and fishing area for use by all members.

¶ 30     We are unpersuaded by these contentions because they conflate *any* benefit with benefits *incident to ownership*. *See Radke v. Union Pac. Ry. Co.*, 138 Colo. 189, 198-99, 334 P.2d 1077, 1082 (1959) (explaining the difference between language granting title to mineral reserves and language granting mere license to remove minerals from land). While it is undoubtedly true that petitioners benefit from holding deeds to Club Ranches, and that they even benefit from the deed restrictions, which protect their ability to access the whole undeveloped grounds for hunting and fishing, those rights nevertheless amount to mere license to use Club property, not fee ownership.

2.     Petitioners Control Their Properties Through the Club

¶ 31     The BOE and BAA also argue that petitioners retain sufficient control to remain fee owners through the Board of Governors (the Board). We find no legal support for this contention.

¶ 32     An association that represents a group of individuals is not equivalent to each individual exercising control over his or her

18

property. *See Clubhouse at Fairway Pines, L.L.C. v. Fairway Pines Estates Owners Ass'n*, 214 P.3d 451, 456-57 (Colo. App. 2008) (holding that common interest community association did not adequately represent the interests of individual owners, who may hold differing opinions from one another and from the association itself); *Dunne v. Shenandoah Homeowners Ass'n, Inc.*, 12 P.3d 340, 344-45 (Colo. App. 2000) (same). While petitioners have some ability to participate in management of the land by exercising their voting rights or running for a seat on the Board, this is hardly the same as exercising exclusive control over one's own property.

¶ 33 This argument would also require us to disregard the Club's corporate form. Governance through a separate corporate entity is not merely a legal nicety; it is substantively different than individual control over property or even collective governance under a different ownership structure. For example, in *Reishus v. Bullmasters, LLC*, 2016 COA 82, a division of this court considered a claim related to a piece of land similarly designated for hunting purposes. *See id.* at ¶ 12. But in that case, the structure of the ownership was a tenancy in common, and the individual owners governed by a simple majority vote. *Id.* at ¶¶ 3-12. The practical effect was that

19

those owners had a greater degree of control over the collective use of the property than these club members, who only vote for representatives to govern the property on behalf of the Club.[2]

¶ 34    Ultimately, the influence petitioners have over Club governance of the land is simply not sufficient control to say that they retain any significant incidents of fee ownership.

3.    Possibility of Future Changes to the Declaration

¶ 35    Next, to the extent the BOE and BAA suggest that the Club could change the declaration, bylaws, and other regulations that deprive petitioners of significant incidents of ownership, we decide assessment controversies based on current realities, not future possibilities. *See Padre Resort, Inc. v. Jefferson Cty. Bd. of Equalization*, 30 P.3d 813, 815-16 (Colo. App. 2001) (holding that assessor was correct to disregard hotel rooms under construction when valuing property because "economic conditions existing outside the base period may not be considered in arriving at the taxable value of property"); *see also Vail Assocs.*, 19 P.3d at 1280 (holding that ski resort held taxable possessory property interest,

---

[2] The members can engage in direct governance only by amending the Club declaration by a vote of 75% of members.

20

notwithstanding that its interest only extended to the year 2031); *Mesa Verde*, 178 Colo. at 57, 495 P.2d at 233 ("It would be a very harsh doctrine that would deny the right of the states to tax lands because of a mere possibility that they might lapse to the United States (for failure to fulfill certain contractual obligations)." (quoting *Balt. Shipbuilding & Dry Dock Co. v. City of Baltimore*, 195 U.S. 375, 382 (1904))). Thus, whether petitioners might be accorded more control of the parcels in the future does not change our present analysis.

### 4. Petitioners Retain the Right to Sell Their Interests

¶ 36 The BOE and BAA also assert that petitioners are the real property owners because they retain the right to sell their parcels. We disagree. The right to sell is not dispositive. *See Loretto*, 458 U.S. at 436 ("[E]ven though the owner may retain the bare legal right to dispose of the occupied space by transfer or sale, the permanent occupation of that space by a stranger will ordinarily empty the right of any value, since the purchaser will also be unable to make any use of the property."). And while petitioners retain the right to sell the deeds to their parcels, the substance of

21

the rights bought and sold is merely license to use the Club grounds, not interest in the land.

¶ 37    To be sure, the alienability of these deeds is unusual. Licenses are typically revocable, unassignable personal privileges that terminate upon transfer of the land.  *See Radke*, 138 Colo. at 207-08, 334 P.2d at 1086-87; *Vill. at Treehouse*, ¶ 19; *Lehman v. Williamson*, 35 Colo. App. 372, 375, 533 P.2d 63, 65 (1975).  But those characteristics are not *necessary* for a license.  *See Radke*, 138 Colo. at 208-09, 334 P.2d at 1087; *Roaring Fork*, ¶ 11.  So, while the use of a deed to convey these licenses is unusual, it does not change the substance of the rights bought and sold.  *See Dep't of Commerce v. Carriage House Assocs.*, 585 P.2d 1337, 1339 (Nev. 1978) (observing that "vacation licenses," which gave holders the right to occupy resort units for a short time, were "an anomaly [that do not] fit neatly into any nice legal terminology," but concluding that they were more akin to contract rights than real property interests).

¶ 38    Accordingly, we reject the contention that the ability to sell a Ranch deed means that the deed conveys a real property interest in the parcel.

22

## 5. CCIOA

¶ 39    The BOE also argues that the Colorado Common Interest Ownership Act (CCIOA) required the Assessor to assess the parcels individually. We need not address this contention because the provision on which the BOE relies does not apply to the Club. Section 38-33.3-105(2), C.R.S. 2017, applies only to common interest communities created after June 30, 1992, unless they have elected CCIOA treatment. §§ 38-33.3-115, -117, -118, C.R.S. 2017. The Club was created in 1979 and has not elected CCIOA treatment.

## 6. Unit Assessment Rule

¶ 40    The BOE and BAA next contend that the unit assessment rule requires taxes to be assessed to the individual members. We do not perceive the unit assessment rule as applicable here.

¶ 41    "The unit assessment rule requires that all estates in a unit of real property be assessed together, and that the real estate as an entirety be assessed to the owner of the fee free of the ownerships of lesser estates such as leasehold interests." *Vill. at Treehouse*, ¶ 32 (citing *City & Cty. of Denver v. Bd. of Assessment Appeals*, 848 P.2d 355, 358 (Colo. 1993)).

¶ 42    The unit assessment rule is not implicated in this case because petitioners are not asking for the taxes to be split between them and the Club. *See City & Cty. of Denver*, 848 P.2d at 359 (The unit assessment rule "prohibits multiple assessments on multiple taxpayers holding disparate interests in a single piece of property."). Instead, they ask us to recognize the Club as the true property owner, despite the legal form. Looking beyond the form to the substance of the parties' rights does not require us to divide the tax allocation.

## 7.    Absent Members

¶ 43    The BOE and BAA further contend that petitioners' arguments were properly rejected because all club members were not joined in the action. We disagree.

¶ 44    First, we are not convinced that the members' owners were necessary or indispensable parties under C.R.C.P. 19. A party is indispensable if the absent "person's interest in the subject matter of the litigation [is] such that no decree can be entered in the case which will do justice between the parties actually before the court without injuriously affecting the right of such person[.]" *Woodco v. Lindahl*, 152 Colo. 49, 54-55, 380 P.2d 234, 238 (1963). Here,

24

petitioners challenge the tax assessments on four parcels of land to which they hold bare legal title. Other club members' assessments are not at issue. Hence, we fail to see how a decision will injuriously affect the absent members.

¶ 45 But, even if the absent club members were indispensable parties, affirming the order would not be the appropriate remedy. The BOE and BAA did not move to join the absent owners or to dismiss the action for failure to join indispensable parties. Instead, they argue that relief should be denied to petitioners on the merits because the other members were not party to the suit. This is not how C.R.C.P. 19 works. *See Fairway Pines*, 214 P.3d at 454 (The indispensable party rule "does not mean that 'a party with the necessary information to make a motion for joinder of an indispensable party at his disposal can sit back and raise it at any time in the proceedings, when the only effect . . . would be to protect himself.'") (alteration in original) (citation omitted); *see also Durango & Silverton Narrow Gauge R.R. Co. v. Wolf*, 2013 COA 118, ¶ 26 (The trial court did not err in issuing summary judgment for plaintiff "where [the defendant] did not move for joinder [of parties he argued were indispensable], but simply raised the issue in his

summary judgment motion."). If the absent club members were indispensable, their absence would require a remand for joinder or dismissal, not affirmation of the order on the merits. *See Fairway Pines*, 214 P.3d at 457 (explaining that proper remedy for failure to join an indispensable party is to join the absent party); *Frazier v. Carter*, 166 P.3d 193, 196 (Colo. App. 2007) (holding that indispensable party's absence "prevent[ed] final resolution of the issues raised" on appeal, and remedy was remand to trial court where the plaintiff would have opportunity to join the absent party).

### III. How Should the Property Value Be Calculated?

¶ 46 Finally, we agree with petitioners that the Assessor improperly valued the parcels, and that the BAA abused its discretion in affirming that valuation.

### A. Standard of Review and Applicable Law

¶ 47 "An assessor's valuation of property for taxation is presumed to be correct." *Cantina Grill*, ¶ 15. The taxpayer bears the burden of rebutting that presumption by a preponderance of the evidence. *Roaring Fork*, ¶ 20. We will set aside a decision by the BAA only if there is no competent evidence in the record to support the decision or "the decision reflects a failure to abide by the statutory scheme

26

for calculating property tax assessments." *CTS Invs., LLC v. Garfield Cty. Bd. of Equalization*, 2013 COA 30, ¶ 59.

¶ 48    Assessors are directed to value property "by appropriate consideration of the cost approach, the market approach, and the income approach to appraisal." *Id.* at ¶ 27 (quoting § 39-1-103(5)(a), C.R.S. 2017).  "The market approach, or comparable sales method, involves an analysis of sales of comparable properties in the market." *City & Cty. of Denver*, 848 P.2d at 357 n.3.  "The assessor is required to use sales of real property only in the valuation process."  3 Div. of Prop. Taxation, Dep't of Local Affairs, *Assessor's Reference Library* § 3, at 3.4 (rev. July 2017) (citing § 39-1-103, C.R.S. 2017).

## B.    Analysis

¶ 49    Because we have concluded that the Club is the true property owner and individual members hold only a license to use Club grounds, we are compelled to conclude that the Assessor's valuation violated the statutory scheme for calculating property tax assessments.  Specifically, the Assessor improperly valued the parcels based on sales of personal property (the members' licenses), not comparable real properties.

¶ 50　The Assessor calculated the value of the individual Ranches by using sales of deeds to other Club parcels in the past few years. But, as we have explained, those deeds conveyed only a license to use the Club grounds — a personal property interest.  Because the value of those sales reflected the value of the personal property conveyed rather than land, the Assessor should not have used them as "comparable sales" in determining the value of the parcels, and the BOE and BAA should not have affirmed that valuation.

## IV.　Conclusion

¶ 51　We reverse the order of the BAA.  On remand, petitioners' parcels[3] should be reassessed as fractions of the Club grounds as a whole, rather than based on the personal property value of the members' licenses to use the Club.  The new assessments should be issued to the Club, not to the individual record holders.

JUDGE BOORAS and JUDGE DUNN concur.

---

[3] Because the BOE and BAA raised the issue of absent Club members, we clarify that *only* petitioners' parcels need to be reassessed.  Resolution of petitioners' challenges to their own 2015 assessments does not require us to address the assessments of any other club ranches.