No. 15,593.

Van Diest *v.* Towle.
(179 P. [2d] 984)

Decided April 7, 1947.   Rehearing denied April 28, 1947.

Mr. H. T. McGARRY, Mr. BEN S. WENDELKIN, for plaintiff in error.

Mr. DAVID P. STRICKLER, Mr. THOMAS M. BURGESS, Mr. DONALD C. McCREERY, Mr. PAUL W. LEE, for defendant in error.

*En Banc.*

MR. JUSTICE STONE delivered the opinion of the court.

VAN DIEST gave his demand promissory note to Towle. Nearly thirteen years after the first and only payment of interest thereon, this suit was instituted for judgment on the note and foreclosure of the collateral security then held. Van Diest pleaded the statute of limitations. The case was tried entirely upon written evidence consisting of the note, partial correspondence between the parties, exhibits concerning corporate reorganization and stipulations. The trial court determined that the evidence established an acknowledgment by the defendant of the indebtedness together with an implied promise to pay the same within six years prior to the institution of the suit, and rendered judgment in favor of Towle. Whether there was such acknowledgment and implied promise is the sole issue requiring our attention.

As collateral security for the $55,000 note here involved, Van Diest deposited notes of General Service Corporation of equal face value secured by 928 shares of the common capital stock of the Utah Ice and Storage Company. General Service Corporation owned 5215 shares, being all, except directors' qualifying shares, of the stock of the Utah Company, and owned all or a controlling interest in the stock of several other service corporations. Nearly six years after the execution of

Van Diest's note, proceedings were instituted in the United States District Court of the District of Colorado for reorganization of General Service Corporation and some of its subsidiaries, including the Utah Company. The plans of reorganization disclose that, in addition to several notes of those corporations held by Van Diest and Towle separately, they held, either jointly or severally, notes of General Service Corporation in the sum of $392,000 principal, upon which there was accrued interest in large amount, which were listed as "notes to officers and stockholders." All the Utah Company stock except directors' qualifying shares were pledged as collateral with the notes of General Service Corporation. Under the plan of reorganization of the corporations a portion of this stock was surrendered for distribution to bondholders and the remainder for exchange for voting trust certificates. Towle forwarded the total of 3432 shares for such distribution and exchange of which only 928 shares were held as collateral with the Van Diest note. From this it would appear that the General Service Corporation notes held by Towle as collateral to the Van Diest note constituted only a small part of his total holdings of those notes. Towle resided in New York City and Van Diest in Colorado Springs. Van Diest was president of General Service Corporation and represented Towle as his attorney in fact in his acceptance of both the original and amended plan of corporate reorganization of the companies. In the reorganization no claim was filed on these notes.

The first letters offered by plaintiff, and held by the court as evidencing a promise by Van Diest to pay his note, were written a few days prior to the court approval of the plans of corporate reorganization. Van Diest wrote Towle as follows:

"If the attorneys are to be believed, the order for the release of General Service from its receivership will be signed on the tenth, which will be Friday of next week. I am planning then to have the directors' meeting of

General Service at which time the directors will accept the exchange of notes for preferred stock, as I have heretofore written you, and also authorize the proposals to the subsidiary companies for the transfer of the physical properties of the subsidiaries, Mon-Tana Service Corporation, Fairbury Service Company, and Hygienic Service Company, to General Service.

"Inasmuch as it is advisable to make the exchange of notes for General Service stock as speedily as possible after the release it would be appreciated if you could have your notes and stock here for such exchange promptly after the directors' meeting has been held.

"In making this exchange I would appreciate your advising me if you prefer to have the stock certificates made out as nearly as possible in the amounts applicable to each note, or to combine the amounts in the proportions as I have heretofore written you. We can handle it, of course, as you prefer.

"I have all matters pretty well prepared, including the waivers of notice and proposed minutes of directors' meetings, deeds of transfer, etc., so that no delays need occur on that account, and we are now figuring the amount of each class of stock which will be applicable to each note and the interest thereon. With this completed the formalities can be quickly further developed.

"As soon as possible after these matters have been carried out I shall have to go to Fairbury to arrange for a locker storage room to be built within the season ice storage room, an element of construction which does not involve great expense, perhaps $500 to $600, but which should be a continual and material source of revenue, particularly during the winter months when we need it most.

"I also expect to go on to Chicago to work out the ice contract situation, I hope for the long future, with the Rock Island and possibly obtain some new business from the Union Pacific.

"As I believe it would be to our distinct advantage and to assist in avoiding possible contingencies, I would like to be in a position to do all of these things very speedily after the release of General Service.

"If you approve of these actions I would appreciate the transmittal of your notes and collateral pertinent thereto, the receipt of which I shall acknowledge immediately upon arrival.

"In that connection it will not be necessary to send me my note to you but it will be necessary to send the General Service notes, with the collateral, attached to that note."

Towle answered:

" * * * With reference to your letter of the 2nd, in the matter of exchanging my General Service notes for shares of stock, a combined certificate will be satisfactory to me.

"The Auditor calls to my attention that your note to which you refer in the last paragraph of $55,000. is secured by 968 shares of Utah Common V.T.C.s plus 3 General Service notes totaling the amount of the face of yours. What was your idea of collateral to secure your note in lieu of that now securing it?"

In reply to that inquiry Van Diest wrote: " * * * With reference to my notes secured by General Service notes which are collateraled by Utah stock, naturally the preferred stocks accruing to me on the notes of General Service which you hold as collateral would then become the collateral to my note. This will apply to the preferred stock, both A and B, to be issued on these notes, both for principal and accrued interest. I trust that this will be satisfactory. Just as soon as I have the stock issued which can be done immediately after I receive the notes from you I will forward to you the corresponding General Service preferred stock to attach to my note to you."

A few days later Van Diest forwarded to Towle powers

of attorney with a letter stating that they are "to be attached to the stock of General Service Corporation standing in my name which I have today sent you applicable as collateral to my notes." The trial court held that these letters and the exchange of collateral each evidenced a promise to pay the note and removed the bar of the statute.

What are the rules by which to test this evidence? The original statute, 21 James I, which is the basis of all our statutes of limitation, made no exception in case of subsequent promise, acknowledgment, or part payment by the debtor; nor does our Colorado statute, today, make such exception. However, at a very early date, by judicial legislation, there was engrafted on the English statute an exception, that in an action of assumpsit a new promise to pay removed the bar of the statute; and a little later this exception was extended to include an acknowledgment of the debt, on the theory that an acknowledgment was an implied promise to pay; and then it was still further extended to include a part payment which, it was held, would remove the bar, on the theory that a part payment constituted an acknowledgment. Later, the statute was still further undermined by Lord Mansfield who held that, the slightest word of acknowledgment will take it out of the statute. *Trueman v. Fentom,* 2 Cowp. 544. For a time this extreme rule was followed, but it was frequently criticised as unwise both by judges and barristers, and was finally repudiated in *A'Court v. Cross,* 3 Bing. 329, where the court held, "that if there be anything said at the time of the acknowledgment to repel the inference of a promise, the acknowledgment will not take a case out of the statute of limitations." This rule has since been followed in England. Kelly, Code Stat. of Lim., p. 139; Angell on Limitations (6th ed.), p. 222; 1 Wood on Limitations (4th ed.), p. 347, §65, and p. 356, §67.

Even before the change of rule in England, Chief Justice Marshall in *Clementson v. Williams,* 8 Cranch 72,

declared that the statute of limitation was entitled to the same respect as other statutes and should not be explained away, and where a debtor declared that the account was due, and that he supposed it had been paid by his partner but that he had not paid it himself and did not know of its being ever paid, these words were considered an insufficient admission from which to infer a promise and remove the bar of the statute. The Chief Justice there said: "It is not, then, sufficient to take the case out of the act, that the claim should be proved or be acknowledged to have been originally just; the acknowledgment must go to the fact that it is still due." Shortly afterwards Justice Story wrote the opinion in *Bell v. Morrison,* 1 Peters 351, which has become a leading case and has been followed and quoted in *Thomas v. Carey,* 26 Colo. 485, 58 Pac. 1093; *Reed v. Interstate Oil Co.,* 41 Colo. 463, 92 Pac. 911; *Sears v. Hicklin,* 3 Colo. App. 331, 33 Pac. 137; and *Adams v. Tucker,* 6 Colo. App. 393, 40 Pac. 483. Judge Story said:

"If the bar is sought to be removed by the proof of a new promise, that promise, as a new cause of action, ought to be proved in a clear and explicit manner, and be, in its terms, unequivocal and determinate; and if any conditions are annexed, they ought to be shown to be performed. If there be no express promise, but a promise is to be raised by implication of law, from the acknowledgment of the party, such acknowledgment ought to contain an unqualified and direct admission of a previous, subsisting debt, which the party is liable, and willing, to pay. If there be accompanying circumstances, which repel the presumption of a promise or intention to pay; if the expressions be equivocal, vague and indeterminate, leading to no certain conclusion, but at best to probable inferences, which may affect different minds in different ways; we think, they ought not to go to a jury as evidence of a new promise, to revive the cause of action. Any other course would open all the mischiefs against which the statute was intended to

guard innocent persons, and expose them to the danger of being entrapped in careless conversations, and betrayed by perjuries.

"It may be, that in this manner, an honest debt may sometimes be lost, but many unfounded recoveries will be prevented; and viewing the statute in the same light, in which it was viewed by English judges, at an early period, as a beneficial law, on which the security of all men depends, we think, its provisions ought not to be lightly overturned; and that no creditor has a right to complain of a strict construction, since it is only by his own fault and laches, that it can be brought to bear injuriously upon him. And if the early interpretation had been adhered to, that nothing but an express promise should take a case out of the statute, it is far from being certain, that it would not have generally been in promotion of justice."

In addition to our frequent approval and quotation of the rule announced in *Bell v. Morrison, supra,* we have likewise declared the rule, in our Colorado decisions, that a new promise to pay is created by a clear and unqualified acknowledgment of the debt (*Adams v. Tucker, supra*); that loose and general expressions with respect to the acknowledgment, which are merely casual, are insufficient (*Thomas v. Carey, supra*); that the testimony must establish the promise clearly and explicitly and must appear to have been unequivocal (*Blackmore v. Neale,* 15 Colo. App. 49, 60 Pac. 952); that an implied promise is created by a clear, explicit and unequivocal acknowledgment of the debt (*Miller v. Kinsel,* 20 Colo. App. 346, 78 Pac. 1075); that the efficiency of a payment to avert the effect of the statute rests in the conscious and voluntary act of the defendant, explainable only as a recognition and confession of the existing liability (*Ferris v. Curtis,* 53 Colo. 340, 127 Pac. 236); and we have further said that stale claims are regarded with suspicion and that a promise to toll the statute must be unequivocal and unconditional (*Hathaway v. Botten-*

*field,* 73 Colo. 356, 215 Pac. 864); that a consideration of public policy is embodied in the statute of limitations and the authorities generally regard this statute as a meritorious defense *(First National Bank v. Mock,* 70 Colo. 517, 203 Pac. 272); and that the burden of proving removal of the bar of the statute rests on plaintiff *(Gregory v. Filbeck's Estate,* 20 Colo. App. 131, 77 Pac. 369). In *Hathway v. Bottenfield, supra,* we cited *Montgomery's Estate,* 259 Pa. 412, 103 Atl. 223, and referred to the rule there announced that a mere general statement by the debtor that he will settle is not sufficient to remove the bar of the statute.

It has been said elsewhere that, "The plain and fair meaning of the party making use of the expression should be sought for, and then permitted to have its legitimate influence, and nothing further, in the decision of the question." *Perley v. Little,* 3 Me. 97; *Gray v. Day,* 109 Me. 492, 84 Atl. 1073, 43 L.R.A. (N.S.) 535, that: "A mere reference to the indebtedness, although consistent with its existing validity, and implying no disposition to question its binding obligation, or a suggestion of some action in reference to it, is not such an 'acknowledgment' as is contemplated by the statute. This must be an unqualified and direct admission of a present-subsisting debt on which the party is liable, and which he is willing to pay." *Hanson v. Towle,* 19 Kan. 273; that: "It is an accepted doctrine that an acknowledgment of the existence of a debt is allowed to remove the bar of the statute, because such acknowledgment or admission carries with it an implied promise to pay. For that reason the acknowledgment must be express, clear, and direct, for it will not do to infer or imply the acknowledgment, and therefrom imply the promise to pay; thus piling implication upon implication." *Kleis v. McGrath,* 127 Ia. 459, 103 N.W. 371, 69 L.R.A. 260.

"Now that the statute of limitations is treated as one of repose, the general rule is that an acknowledgment of a debt barred by the statute waives the bar of the

statute only when the acknowledgment is in such form as to amount to an implied promise to discharge the debt. * * * In order to amount to an implied promise to pay, the acknowledgment must recognize the debt as a present existing liability. Nothing short of this will amount by implication to a promise to discharge the debt." 6 Page on the Law of Contracts, p. 6064, §3492.

"It may now be said that the theory of acknowledgment is settled in a fairly satisfactory manner as to simple contracts on the principle that there is required either an express promise to pay the debt or an absolute admission of indebtedness from which a promise to pay may naturally be inferred, which new promise is sufficiently supported by the consideration of the past debt." Banning, Limitation of Actions (2d ed.), p. 46.

The modern tendency is to look with favor upon statutes of limitation, which are considered wise and beneficent in their purpose and tendency, are looked upon as statutes of repose, and are held to be rules of property vital to the welfare of society (34 Am. Jur., p. 24, §14), and while formerly looked upon with disfavor and strictly construed, the present judicial attitude is that of liberal construction (34 Am. Jur., p. 41, §38).

Under chapter 172, Session Laws of 1921, '35 C.S.A., c. 102, §26, an acknowledgment or promise to be evidence of a new or continuing contract sufficient to remove the bar of the statute must now be in writing and signed by the parties to be charged therewith. But this statute affects only the mode of proof and does not alter the substantive law. Wood on Limitations (4th ed.), p. 460, §32.

Having in mind these rules and the situation of the parties in the present action, where is there evidence of recognition of the debt as an existing liability from which can be implied a promise to pay, in the correspondence in connection with exchange of collateral? It is evident that the correspondence did not in any way concern the indebtedness. The parties were mutually

and very extensively interested in the companies which were in process of reorganization, and in protecting their common interests and in carrying out their plans to that end. These plans included the acceptance of preferred stock in General Service Corporation in payment for the $392,000 principal and almost $100,000 accrued interest of the General Service Corporation notes held by Towle and Van Diest. Van Diest was in Colorado, was president of the company, and had represented Towle under power of attorney in reorganization matters. Their correspondence was entirely with reference to their common interest and the matter of debt was never mentioned. In writing Towle to forward the notes to be exchanged for preferred stock, Van Diest's statement that it would not be necessary to send his note was obviously made, not to infer liability, but to identify the papers to be forwarded. Towle's subsequent inquiry: "What was your idea of collateral to secure your note in lieu of that now securing it?" was apparently intended to obtain assurance that the stock to be issued in place of the notes payable to Van Diest, but assigned by him to Towle as collateral, would be forwarded to Towle as well as the stock to be issued in lieu of the notes which were payable to Towle himself. Such stock rightfully belonged to Towle whether or not the Van Diest note was barred by the statute, so the question of continued liability on the note was not involved either in the question or answer, and Van Diest assured him that "naturally," the stocks issued in lieu of the collateral notes would become collateral in their stead, and that Van Diest would promptly forward them (in other words, that Towle would get the substitute collateral to which he was legally entitled). Then a few days later, when Van Diest forwarded to Towle his preferred stock, he enclosed powers of attorney for the two certificates which were applicable as collateral to his note and so advised Towle. Throughout his correspondence all reference to Van Diest's note is patently by way

of identification and not at all as an acknowledgment of liability. It fails to satisfy the requirement that, "the acknowledgment from which the law is to raise a promise, contrary to the provisions of the statute, must be clear and express, where the mind is brought directly to the point, debt or no debt at the present time, not whether the debt was once an existing demand." *Harrison v. Handley,* 1 Bibb (Ky.) 443; *Bell v. Morrison, supra.* Under such circumstances references to the note do not constitute an acknowledgment sufficient to remove the bar of the statute.

■ As to the exchange of collateral, it must again be remembered that the question involved is not whether an exchange was made, but whether or not such exchange evidenced a new promise to pay the debt. It is the rule that the voluntary giving of collateral by a debtor is evidence of an acknowledgment of the debt. *Adams v. Tucker, supra.* Whether this might be true in case of the substitution of collateral at the request of the debtor, would depend on the probative value of the evidence to establish a new promise. This was neither. The exchange of stock for notes was a matter in which both parties were concerned entirely outside any question of Van Diest's liability on his note. The great part of the stock issued to Towle in lieu of his General Service Corporation notes had no connection whatever with Van Diest's debt. Towle agreed with the corporation for exchange of its notes which he owned, for preferred stock, and evidently desired to include, as well, the notes he held as collateral to Van Diest's notes. He had full control over those notes; there is no suggestion or presumption that the exchange was made at the request of the debtor, and the creditor received in return for these notes only the new collateral to which he was legally entitled. Van Diest's correspondence concerning the exchange of collateral was not by virtue of his debt to Towle, but by virtue of his being attorney for Towle and an officer of the corporation.

We find few cases in the books discussing the effect of exchange of collateral as tolling the statute. Two recent cases involve that issue. Four co-makers joined in the execution of promissory notes which were assigned to Western Coal & Mining Company. After the notes were barred by the statute, the holder sent to the several makers like forms of agreement for signature covering exchange of collateral stock pursuant to a plan of corporate reorganization, which the makers signed and returned. Action was subsequently brought against one of the makers in Arizona (*Western Coal & Mining Co. v. Hilvert,* 61 Ariz. 131, 142 P. [2d] 411), and against another maker in California (*Western Coal & Mining Co. v. Jones* (Cal.), 167 P. [2d] 719). In both cases defendants set up the statute of limitations and plaintiffs relied on the agreement for exchange of collateral as constituting an acknowledgment of the debt. That agreement recited, in effect, that in consideration of the consent to the plan of reorganization by the plaintiff, which held the stock "as security for the obligations of" the makers, the latter agreed to endorse the new stock certificates for the same purpose as the old ones, that the new stock should be deemed substituted by the holder "without releasing or in anywise impairing the liability of the undersigned under said notes; and said new common stock so deposited under said notes should be as fully subject to the lien of said notes as if specifically referred to and described in said notes."

The Arizona Supreme Court held that there was no evidence of willingness to pay the debt, and, therefore, the agreement for substitution of collateral did not remove the bar of the statute. A similar conclusion was reached by both the California trial court and its court of appeals, but the California Supreme Court determined that there was an admission of an existing liability in the recital of the agreement that the old stock was held as security for defendant's obligation, that the new stock was to be deemed substituted for the old, that the sub-

stitution should not impair the liability of defendant under said notes, and that the stocks should be subject to the lien of said notes; particularly under the California statute providing that when the debt is barred, the lien is extinguished. Under that statute, recognition of the lien was considered tacit admission of liability. But such would not be the case in Colorado, where the lien is not extinguished by the bar of the statute. In none of these cases is it suggested that the substitution of collateral securities pursuant to corporate reorganization or other general plan, of itself, implied a promise to pay the debt, and we find no evidence of agreement to pay the debt in the exchange of collateral here shown.

The second correspondence which the trial court held to evidence a promise to pay occurred when Towle wrote Van Diest:

"Another matter which should be cleared up is that of a demand note I hold of yours. * * * There have been so many other matters seemingly of much more importance I have just overlooked attending to this.

"I would like a new note in its stead and would thank you to advise me how you wish it figured. Naturally I shall not compute it at 7%, nor on a quarterly basis either. In order to be business like, however, it seems to me fair to figure the new principal on an annual compound basis at 5% * * *."

To this letter Van Diest replied:

"I have your letter of the fourteenth with reference to my note.

"Of course, the interest on this note should have been placed on a basis corresponding to that of General Service notes, but that is not the important element.

"It would be impossible for me to pay this note as all the property that I have of every kind has been pledged. All marketable securities have been long since sold and used during this period of depression.

" * * * There is an aggregate of about $40,000 of these unpaid bank notes and they have as collateral attached

not only the ranch but all of my stock of General Service. It may be that I can get the common stock released but I am not at all sure.

"It would be far better for you to take the collateral which is now attached to your note and have the shares transferred to your name and have the matter over with and if at some later date it should be possible for me to secure the release of additional General Service securities you may have some of those also.

"Under the circumstances it would be useless for me to make a new note for the amount stated in your letter."

It will be noted that in this correspondence, nearly eight years after the execution of the demand note and more than seven years after any payment of interest thereon, Towle for the first time made any mention of the matter of Van Diest's indebtedness. The substance of the debtor's reply is: 1. The question of interest is unimportant; 2. It is impossible for me to pay; 3. You had better take the collateral and have it over with; 4. It would be useless for me to make a new note. Each of these statements instead of evidencing "an implied promise to pay" evidences an intent not to pay.

In *Bailey v. Crane*, 21 Pick. (Mass.) 323, the debtor wrote the creditor, "I received your note yesterday. I hasten to inform you that next week I shall be able to send in to Mr. Charles Thatcher * * * statement of my affairs. Mr. Thatcher will show you the whole of my property and ask for a discharge. I should have done this before, but since I have been back, have been sick, and have been obliged to work for my board. I have large demands on the merchants of Savannah and Augusta, but I cannot collect them and think I never shall." The court said: "The letter contains no express promise. And although it may perhaps imply an acknowledgment of indebtedness, yet if so, it contains such qualifications and explanations as to exclude any implication of a promise to pay. The defendant obviously does not contemplate a payment of the note, but avows

his inability to pay, desires a discharge without payment, and clearly does not express a willingness, much less assume an obligation, to pay."

In *Richards v. Hayden*, 8 Kan. App. 816, 57 Pac. 978, in response to demand of payment debtor wrote, " * * * I am very sorry I have not the money. I have a note due on my home * * * and I have been unable to pay the interest * * *; also mortgage due in El Dorado * * *. Do not see how I am going to meet them, but will have to do the best I can. * * * Will let you hear from me in a short time as to what I can do." This was held not sufficient, and the court said, "We hold that, to toll the statute, a written acknowledgment must itself be unqualified and direct, and not dependent for its meaning on some other writing or on a possible construction of its language."

In *Berghuis v. Burges*, 205 Minn. 151, 285 N.W. 464, the debtor wrote: " * * * I hardly know what to write to you as I am unable to make any payment on that note much as I would like to if I only had the money. When I sold my printing plant I sold it with a small payment down * * *. I had hopes to get some money from my son Charles. * * * So what can I do. Much as I would like to clear up that note I can't very well deprive my family from living and my health is such that I can not do anything any more * * *. I am sorry that I can not clean up this obligation, but I simply cannot at this time." The court said: "While defendant acknowledges a subsisting obligation upon the note, the entire letter expresses inability then to pay anything and holds out no promise to pay in the future. The willingness to pay is conditional upon coming into possession of money or means wherewith to pay. * * * There is no language which can be tortured into a promise to pay the note. * * * We think the whole tenor of the letter repels a promise to pay at any time in the future."

Such is our conclusion in regard to Van Diest's letter here, and we have not overlooked his statement

in the letter that *if* he can get release of his General Service securities which were pledged he will give Towle some of them. That proposal is patently conditional on Towle's taking over his collateral and "having the matter over with." Had it specified a definite amount of such securities that he would give, then it would have been a new promise under which Towle could have held him, not for the full amount of the note but only for the amount of securities promised, or their value, and for that amount only on proof that the securities had been released to the debtor. "And it has been often held that when the debtor, in the same writing by which he acknowledges the debt, without expressly promising to pay, agrees that certain property shall be applied to its payment, there can be no implication of a personal promise to pay." *Shepherd v. Thompson,* 122 U.S. 231, 7 Sup. Ct. 1229, 30 L. Ed. 1156. "A mere offer to give security is insufficient, especially where the offer is rejected." 37 C.J., p. 1114, §587. Van Diest's suggestion of giving further stock is, at the most, a gesture in the direction of a compromise with the purpose of leaving an opening for Towle to come back with a query or proposal as to the additional stock Van Diest would be willing to give in settlement. An offer in compromise is not an admission of the debt so as to remove the bar of the statute. 1 Wood on Limitations (4th ed.) 418; 102 Am. St. Rep., annotation at page 776.

█ This case was submitted on documentary evidence. There is no dispute as to the facts. The sufficiency of the statements to remove the bar of the statute is a question of law for the court. Such being the case we are not bound by the decision of the trial court but are under obligation to determine those questions here. *Morrell v. Ferrier,* 7 Colo. 22; *Conklin v. Shaw,* 67 Colo. 169, 185 Pac. 661. We are pursuaded that the statements relied on by plaintiff were not sufficient to remove the bar.

Accordingly, the judgment is reversed with instruc-

tions to dismiss the action on the note without prejudice to further proceedings in foreclosure of the collateral.

MR. JUSTICE JACKSON not participating.