William E. WILEY, Plaintiff-Appellant,

v.

BANK OF FOUNTAIN VALLEY,
Defendant and Third-Party
Plaintiff-Appellee,

v.

Daniel R. WILEY, Third-Party
Defendant-Appellant.

No. 79CA0847.

Colorado Court of Appeals,
Div. III.

June 4, 1981.

Gerald D. Sjaastad, Colorado Springs, for plaintiff-appellant and third-party defendant-appellant.

Gresham, Stifler, Gentry & Covell, P. C., Kenneth L. Covell, Colorado Springs, for defendant and third-party plaintiff-appellee.

KIRSHBAUM, Judge.

Plaintiff, William E. Wiley, appeals the trial court's directed verdict denying his damage claims against the Bank of Fountain Valley for allegedly "improper collection" on a promissory note and granting the bank's counterclaim against him for a deficiency judgment. Third-party defendant, Daniel R. Wiley, appeals the trial court's decision directing a verdict against him on the bank's third-party claim for a deficiency judgment. We reverse and remand for a new trial.

The record discloses the following facts. In June 1976, plaintiff executed a $100,000 promissory note and a security agreement in exchange for a bank loan. The note was signed by plaintiff individually and on behalf of the gold Hill Mesa Corporation, of which he was the president and sole stockholder. It was secured by both real and personal property and by the written guarantee of Daniel R. Wiley. The collateral listed in the security agreement includes, *inter alia*, a 1973 Mercedes Benz automobile; a deed of trust on the three and one-half acre parcel of real estate (the "Moreno land"); 100 percent of the stock in Gold Hill Mesa Corporation; and a promissory note for $39,677.26 payable to plaintiff (the "Medill note"), which note was secured by certain specified real property (the "Medill land"). The security agreement provides that in the event of default the bank may take immediate possession of the collateral with or without legal process, may exercise rights and remedies granted secured parties by Article 9 of the Uniform Commercial Code, and may exercise such other rights as are provided by law.

In December 1976, plaintiff defaulted on the note. At the request of Daniel Wiley and plaintiff, the bank's attorney, Lawrence E. Addy, delayed initiating any collection efforts until June 1977. On June 17, 1977, Addy sent a notice of default to Gold Hill Mesa Corporation and plaintiff. On June 30, 1977, plaintiff was notified by Addy that the Medill note and the security therefor would be offered for public sale on August 31, 1977, at 10:00 a. m. pursuant to § 4–9–504, C.R.S.1973. The letter stated that foreclosure proceedings would be initiated against the Moreno land through the

office of the Public trustee and requested delivery of the automobile to the bank.

At plaintiff's request, the public sale of the Medill note scheduled for August 31, 1977, was postponed. The sale was held on January 20, 1978, at which time the bank purchased the Medill note for $10,000 and then credited that sum to the Wiley note. Plaintiff testified at trial that he did not receive notice of the January 20 sale. Addy testified that his records indicated that such notice was sent to plaintiff in the manner mail routinely went out from his office.

The Moreno land was sold by the Public Trustee on February 16, 1978, to the bank for $108,872.17, and the bank credited that amount to the Wiley note. The order approving the sale of this land noted a deficiency of $12,000 remaining on the Wiley note. Wiley did not attend the sale and does not dispute the fairness of the price paid by the bank for this land.

The Medill land was sold by the public trustee on March 28, 1978. The bank, the sole bidder, purchased the property for the sum of $25,000. Wiley did not attend the sale. The bank credited the entire sum to the Medill note.

On November 6, 1978, the bank sold the Wiley note, the Medill land, the Moreno land, and the remaining security for the Wiley note to Pirahna Properties, Inc., for approximately $142,000. Pirahna subsequently offered the Gold Hill Mesa Corporation stock at a public sale and purchased that stock for $1,000. This amount, minus costs of the sale, was credited to the Wiley note. On April 9, 1979, Pirahna assigned the Wiley note back to the bank for no consideration.

Plaintiff's complaint against the bank alleges wrongful appropriation of collateral, unjust enrichment, charging of excessive attorney fees, and reckless misconduct. It requests an award of actual and punitive damages and return of the remaining collateral. The bank's counterclaim against plaintiff and third-party complaint against Daniel R. Wiley, guarantor on the Wiley note, alleges that $12,152.86 remains due and owing on the Wiley note.

The trial court directed a verdict for the bank on all issues except liability, reserving the question of the reasonableness of the attorney fees claimed by the bank for its collection efforts. It concluded that although the question of notice to plaintiff respecting the sale of the Medill note constituted a question of fact, there was no evidence that plaintiff suffered damage because of any lack of notice, that the Medill note was sold in a commercially reasonable manner, and that, therefore, such fact question was not material to the case. The jury awarded the bank $6,740 in attorney fees. The trial court entered judgment against plaintiff on his damage claim and for the bank in the amount of $14,658.58, consisting of: $470.28 deficiency on the Wiley note; attorney fees of $6,740; costs of $1,388.30; and additional attorney fees of $6,050.00.

■ Plaintiff first argues that § 4–9–501(4), C.R.S.1973, of the Uniform Commercial Code prohibits a creditor with a security interest in both real and personal property from proceeding simultaneously against the personalty under Article 9 of the Code and against the realty pursuant to real property law in case of a default. We disagree.

Section 4–9–501, C.R.S.1973, provides as follows with respect to default when both real and personal property are security for the debt:

"(1) When a debtor is in default under a security agreement, a secured party has the rights and remedies provided in part 5 of this article and, except as limited by subsection (3) of this section, those provided in the security agreement. He may reduce his claim to judgment, foreclose, or otherwise enforce the security interest by *any available judicial procedure. . . . The rights and remedies referred to in this subsection are cumulative.*

. . . .

(4) If the security agreement covers both real and personal property, the secured party may proceed under part 5 of this article as to the personal property, or he may proceed as to both the real and the

personal property in accordance with his rights and remedies in respect of the real property in which case the provisions of said sections do not apply." (emphasis added)

The official comment to this section states:

"In the interest of simplicity and speed subsection (4) permits, *although it does not require*, the secured party to proceed as to both real and personal property in accordance with his rights and remedies in respect of the real property." (emphasis added)

Plaintiff contends that these provisions mandate an election by the secured party, who must either pursue his interest in personal property collateral under the Uniform Commercial Code and forego his interest in real property collateral, or pursue both real and personal property interests under a C.R.C.P. 120 proceeding or in some other manner "under Colorado real property law."

■ Section 4–9–501 must be interpreted in light of the overall policy of the Uniform Commercial Code to expand creditor's remedies with respect to personal property collateral. *Bilar, Inc. v. Sherman*, 40 Colo. App. 38, 572 P.2d 489 (1977); *see Alexander Dawson, Inc. v. Sage Creek Canyon Co.*, 37 Colo.App. 339, 546 P.2d 969 (1976). Real property collateral is explicitly excluded from Article 9 coverage, § 4–9–104(j), C.R. S.1973, and Colorado's foreclosure statutes provide greater protection for debtors than is provided under Article 9 of the Uniform Commercial Code. In view of the General Assembly's purpose to expand creditors' rights with respect to personal property security interests, we conclude that § 4–9–501(4), C.R.S.1973, cannot be interpreted to reduce rights of secured creditors with respect to personal property in cases where both real property and personal property are listed as security for a debt.

Plaintiff's reliance on decisions from other jurisdictions is misplaced. *Walker v. Community Bank*, 10 Cal.3d 729, 111 Cal. Rptr. 897, 518 P.2d 329 (1974) holds that a creditor who elects to foreclose on his personal property thereby loses his security interest in real property. The decision in *Walker*, however, involves the interaction of the Uniform Commercial Code with Cal. Civ.Proc. Code § 726 (West) which provides for a strict election of remedies by the holder of a security interest in real estate. Colorado law contains no such provision. *United States Aircraft Financing, Inc. v. Jankovich*, Ind.App., 407 N.E.2d 287 (1980), and *Hildner v. Fox*, 17 Ill.App.3d 97, 308 N.E.2d 301 (1974), simply hold that a secured party with security interests in both real and personal property has an option of proceeding against the personalty under the Uniform Commercial Code or proceeding against both the real and personal property under real property laws, and that if he adopts the latter procedure, the Code is inapplicable to the personalty. These cases do not determine whether the secured party simultaneously may proceed against the personalty under the Code and against the realty in a separate proceeding.

Section 4–9–501(1), C.R.S.1973, provides that the rights and remedies in that subsection are cumulative. Hence, a creditor is not required to make an election of remedies. *Bilar, Inc. v. Sherman, supra; see Michigan National Bank v. Marston*, 29 Mich.App. 99, 185 N.W.2d 47 (1970). While some creditors may prefer to settle all their claims in one forum, particularly if their collateral consists primarily of real property, it is far from certain that a C.R.C.P. 120 proceeding could adequately resolve conflicts over both real and personal property collateral. We conclude that § 4–9–501(4) does not prohibit a creditor from proceeding against both types of collateral simultaneously in separate proceedings. *See In re Indian Springs Farm & Ranch, Inc. v. Production Credit Ass'n*, 27 UCC Reptr. 832 (D.Utah 1979); *and see 69 Am.Jur.2d, Secured Transactions § 559 at 450 (1973).*

■ Plaintiff also argues that the trial court erred in refusing to submit to the jury the question of whether he received notice of the public sale of the Medill note. We agree.

■ At trial, plaintiff claimed that although he received notice of the initial scheduled public sale of the Medill note, he

was not notified of the rescheduled sale which occurred on January 20, 1978. The Uniform Commercial Code requires reasonable notice to be given to debtors of the time and place of any public sale. Section 4–9–504(3), C.R.S.1973. The bank's evidence that its letter of notice would have been mailed in the normal course of business operations created only a rebuttable presumption that the letter was posted. *National Motors, Inc. v. Newman,* 29 Colo. App. 380, 484 P.2d 125 (1971). The trial court correctly concluded that plaintiff's testimony that he had not received such notice was sufficient evidence to overcome the presumption.

■ However, its further conclusion that plaintiff failed to demonstrate any damage attributable to any lack of notice is not supported by the record. In *Community Management Ass'n v. Tousley,* 32 Colo.App. 33, 505 P.2d 1314 (1973), this court held that the failure of a secured party to give reasonable notice of a sale of repossessed security did not necessarily defeat the creditor's right to recover a deficiency judgment in a subsequent action, but rather required such creditor to assume the burden of proving the value of the repossessed property by evidence other than the amount paid for the property at the sale. The court also noted that in such circumstances the debtor could benefit from the presumption that the value of repossessed collateral is equal to the value of the outstanding debt.

Here, it is not disputed that if on January 20, 1978, the value of the Medill note was in fact equal to or greater than the amount of the outstanding debt, the bank could not claim any deficiency against plaintiff. Should it be determined that notice was not given and that, therefore, the $10,000 paid by the bank for the Medill note could not be considered as evidence of the note's value, the jury could well have determined the bank's counterclaim adversely to the bank. *See, First National Bank of Denver v. Cillessen,* Colo.App., 622 P.2d 598 (1980); *see also Universal C. I. T. Credit Co. v. Rone,* 248 Ark. 665, 453 S.W.2d 37 (1970).

Moreover, the question of lack of notice is also relevant to the plaintiff's claims in this case. The complaint alleges as alternate applicable remedies a request for a declaration that no deficiency existed and a demand for return of certain collateral and damages. Hence, the actual value of the Medill note is relevant to plaintiff's claim that the bank's acquisition of this collateral relieved plaintiff from any further obligation under the Wiley note. *See Young v. Golden State Bank,* 39 Colo.App. 45, 560 P.2d 855 (1977).

At trial, William Wiley, plaintiff's chief officer, testified that prior to the public sale of the Medill note he had informed Addy that the Medill land was worth $75,000. Addy testified that he and the bank's president had discussed the value of the Medill land in determining the amount the bank should bid for the Medill note. The face value of the Medill note was $39,677.72.

On the basis of this conflicting testimony alone the jury could have concluded that the Wiley note was worth more than $10,-000 at the time of the public sale. Were the jury to determine that no notice was sent, the bank would not be entitled to rely upon the $10,000 sum paid for the Medill note as any evidence of the actual value thereof, *see Community Management Ass'n v. Tousley, supra,* and the determination of the actual value of that note at the time of the sale would be even more difficult. Because disputed material questions of fact remained as to notice and as to the value of the Medill note, entry of a directed verdict against plaintiff was error. *See Young v. Golden State Bank, supra.*

The judgment of $12,790.00 for combined attorney fees and $1,388.30 for costs is also reversed. On remand, the amount of attorney fees awarded for the bank's collection efforts will be influenced by the determination of whether proper notice was sent.

Plaintiff further argues that the bank lacks standing to sue for a deficiency judgment on the Wiley note and that the evidence creates a jury question concerning the validity of the note's reassignment to the bank. As we have reversed the deficiency judgment award, we do not address this issue.

The judgments denying plaintiff's damage claim, granting the bank's counterclaim and third-party claim, and awarding attorney fees and costs to the bank are reversed, and the cause is remanded for a new trial consistent with this opinion.

ENOCH, C. J., and BERMAN, J., concur.