Delmar E. COOPER, G. Richard Smith, Ronald Lynn Cooper, Gary Ray Cooper, Debora Jean Cooper, Gail Rene Cooper, Daniel R. Cooper, Paul E. Cooper, Catherine A. Cooper, Lanny D. Cooper, Sherry A. Folger, and Dianne Garton, Plaintiffs–Appellees,

v.

The FIRST INTERSTATE BANK OF DENVER, N.A., Defendant–Appellant.

No. 85CA0939.

Colorado Court of Appeals, Div. III.

Jan. 14, 1988.

Rehearing Denied March 3, 1988.

Certiorari Denied June 6, 1988.

Madden & Strate, P.C., William J. Madden, Wheat Ridge, for plaintiffs-appellees.

Martin J. O'Fallon, Denver, for plaintiffs-appellees Sherry A. Folger and Dianne Garton.

Sherman & Howard, Joseph J. Bronesky, Steven D. Plissey, Denver, for defendant-appellant.

TURSI, Judge.

The defendant, First Interstate Bank of Denver (Bank), appeals the judgment which returned to plaintiffs, Delmar E. Cooper, G. Richard Smith, Ronald Lynn Cooper, Gary Ray Cooper, Debora Jean Cooper, Gail Rene Cooper, Daniel R. Cooper, Paul E. Cooper, Catherine A. Cooper, Lanny D. Cooper, Sherry A. Folger, and Dianne Garton, the interest portion of the proceeds from collateral that had secured a promissory note held by the Bank. The Bank asserts the trial court erred: (1) by determining the plaintiffs had not waived the statute of limitations on the promissory note; (2) by interpreting the security agreement to apply the collateral to only the principal indebtedness and not the accrued interest; and (3) by denying it attorney fees. We agree with the Bank's second contention, reject its remaining contentions, and therefore reverse in part and affirm in part.

In January of 1968, Delmar E. Cooper and Donald S. Cooper (obligors) executed a promissory note payable to the American National Bank of Denver, the predecessor of the defendant. In the event of default, the note provided for interest at 12% per annum to accrue from the date of default.

As collateral for the loan, the obligors pledged 1,474 shares of capital stock in the Rocky Mountain Bank (RMB). Various assignments were made within the Donald and Delmar Cooper families which ultimately resulted in the ownership of those shares by all the plaintiffs herein.

The obligors defaulted on the note in January of 1969. At the time of default, they owed $253,848.44 in principal.

In February of 1969, the Colorado Bank Commissioner and the Federal Deposit Insurance Corporation (FDIC) took control of the Rocky Mountain Bank and began liquidation proceedings.

By letter dated September 1969, the obligors acknowledged that the promissory note was past due and that, under the terms of the note, the Bank could institute collection proceedings and dispose of the collateral. However, they explained that the value of the shares of stock in RMB would remain unknown until the FDIC completed the liquidation proceedings, which could take years. Therefore, they requested the Bank make no disposition of the stock at that time and waived any claim that they had against the Bank as pledgee of the stock. They also noted that, under the terms of the promissory note, the Bank had the right to register the stock in its own name and stated they had no objection to the Bank doing that.

The Bank subsequently attempted to transfer the stock into its own name, but the Colorado Bank Commissioner forbade it to do so until 1980. The Bank obtained a

trial court order approving a transfer of the stock to itself on November 3, 1980. The Bank made no effort to obtain judgment on the note or otherwise proceed against the collateral.

The FDIC completed the liquidation proceedings in 1984 and established the value of the stock in RMB to be $392.10 per share. The trial court subsequently entered an order approving a liquidating dividend distribution of the assets to the named shareholders, which resulted in a distribution to the Bank of $577,955.40.

Thereafter, the obligors made demand upon the Bank to distribute to them a share of the monies paid upon the liquidation. The Bank refused to do so, and plaintiffs brought this action against the Bank.

The case was tried to the court on stipulated facts and documents. The plaintiffs contended that the bank was entitled to principal on the note only, *i.e.*, the sum of $252,848.44 without interest, and alleged that the Bank was not entitled to any of the liquidating dividend in excess thereof. They maintained that the Bank's refusal to distribute to them the remaining $325,-106.96 of the liquidating dividend constituted a conversion of their property.

The Bank answered that it was entitled to the principal amount due on the note as well as interest at the rate of 12% per annum computed from the date of default. The Bank further alleged that it had properly applied the amount of the liquidating dividend first against the default interest due and then against the principal amount due, which left a remaining debt to the Bank in the principal amount of $134,-093.52. Accordingly, the Bank counterclaimed, seeking a judgment of $134,093.52 plus interest at the rate of 12% per annum and reasonable attorney fees.

The trial court determined that the Bank could foreclose on the collateral pursuant to the security agreement. However, it also determined that the security agreement did not mention interest; therefore, the Bank could only apply liquidation proceeds from the collateral to the principal indebtedness. It further concluded that the Bank's counterclaim based on the promissory note was barred by the statute of limitations. It awarded the plaintiffs $325,106.96, the portion of the liquidation proceeds in excess of the principal sum of $252,848.44 due on the note that it awarded to the Bank. The trial court also denied both parties' claims for attorney fees.

## I.

The Bank argues that the trial court erred by denying it a deficiency judgment on the note because the plaintiffs had waived all defenses, including the statute of limitations on the note. We disagree.

■ Waiver is the intentional relinquishment of a known right and waiver may be implied when a party engages in conduct which manifests an intent to relinquish the right or privilege, or acts inconsistently with its assertion. *Department of Health v. Donahue*, 690 P.2d 243 (Colo.1984). The conduct must be free from ambiguity and clearly manifest the intention not to assert the benefit. *Department of Health v. Donahue, supra.*

Here, the obligors wrote the Bank a letter requesting that it await the conclusion of liquidation proceedings before disposing of the security. The letter provided in part:

"[W]e request that you make no disposition of the stock at this time. We hereby waive any claim that we might have against you as pledgee of the shares of stock of the Rocky Mountain Bank for failure to make disposition of the shares or otherwise foreclose on the collateral."

■ This language was not an express waiver of the statute of limitations on the note. Nor was it an implied waiver since the letter discusses only the disposition of collateral and not all remedies available under the note.

The Bank also argues the plaintiffs were estopped to assert the statute of limitations. Again, we disagree.

■ If a party by its acts or omissions contributes to the running of a statute of limitations, the doctrine of equitable estop-

pel will prevent its raising that defense. *Strader v. Beneficial Finance Co.*, 191 Colo. 206, 551 P.2d 720 (1976). However, equitable estoppel requires proof of each element thereof, *Federal Lumber Co. v. Wheeler*, 643 P.2d 31 (Colo.1981), and one of the four elements of the doctrine is that the party asserting the estoppel must be ignorant of the true facts. *Department of Health v. Donahue, supra.*

■ Here, the Bank was aware of the true facts; therefore, estoppel does not apply. The statute of limitations ran on the note, and the trial court did not err by denying the Bank a deficiency judgment on it.

## II.

The Bank asserts that the trial court erred in interpreting the note/security agreement by severing the single agreement into two separate and distinct documents. We agree.

The trial court determined that although the note provided for interest, the security agreement did not mention interest and the resulting ambiguity in the agreement should be construed against the draftor, the Bank. Therefore, it concluded the only indebtedness secured by the RMB stock was the principal on the note.

Since the facts were stipulated and the note/security agreement is in the record before us, interpretation of the agreement is a question of law, and we are not bound by the trial court's conclusions. *Atchison, Topeka & Santa Fe Ry. Co. v. North Colorado Springs Land & Improvement Co.*, 659 P.2d 702 (Colo.App.1982). The meaning and effect of a contract is to be determined from an examination of the entire instrument, not merely from isolated clauses or phrases. *International Technical Instruments, Inc. v. Engineering Measurements Co.*, 678 P.2d 558 (Colo.App. 1983).

■ The note/security agreement provided in part:

"[I]n the event of default in the payment of the principal or interest of this note, this note shall draw interest at the rate

of 12% per annum.... As security for the payment of this note and any other liability or liabilities of the undersigned to the holder ... the undersigned grants a security interest to the holder in and pledges to the holder the property listed below; and any and all additions, accessions and substitutions thereto or therefore...."

The contract shows a single, integrated agreement by which the obligors borrowed money. It does *not* specifically limit the security to the principal of the note, but rather generally provides the RMB stock as security for the note. The plaintiffs concede that the note provides for principal and interest. Therefore, we interpret the contract as a security agreement covering the principal and interest on the note. *See Sherman v. Sprentall*, 709 P.2d 602 (Colo. App.1985).

The plaintiffs argue that the security provision of the contract provided only that the collateral secured the "liability" of the makers. They cite several cases from other jurisdictions and maintain the obligation to pay interest was merely incidental to the principal obligation; therefore, they argue, when the statute of limitations ran on the enforcement of the note, the right to recover interest was barred.

However, the issue here is not whether there was an action on the interest separate from principal, but whether there was an interest debt due on the note secured by the RMB stock. The plaintiffs admitted liability for the principal at trial and their argument fails to explain why the interest should be treated differently than the principal. The plaintiffs have not raised the question of whether interest was tolled on the running of the statute of limitation.

The plaintiffs also cite *Martinez v. Continental Enterprises*, 730 P.2d 308 (Colo. 1986) and contend that since the statute of limitations ran on the note, the right to enforce the security agreement also failed. Therefore, they maintain, the trial court judgment should have returned the full value of the stock to them.

However, *Martinez v. Continental Enterprises* is inapposite because it applies

statutes pertinent only to security interests in real property. Sections 38–40–105, 38–40–112, and 38–35–117, C.R.S. (1982 Repl. Vol. 16A) were passed in 1927 as part of "[a]n Act concerning real property and to render titles to real property and to interests and estates therein, more safe, secure and marketable." Colo.Sess.Laws 1927, ch. 150 at 585. Section 38–39–112, C.R.S. (1982 Repl.Vol. 16A) was passed in 1929 as part of "[a]n Act concerning sales of real property on execution and lien foreclosures and the redemption therefrom." Colo.Sess. Laws 1929, ch. 151 at 538.

■ Although the title of a statute is not dispositive of legislative intent, it may be used as an aid in construing a statute. *Martinez v. Continental Enterprises, supra.* The 1927 real property legislation did not affect personal property security transactions. F. Storke & D. Sears, *Colorado Security Law* § 83 (1955).

Security interests created by contract, including pledges, assignments, and chattel mortgages, are controlled by article nine of the Colorado Uniform Commercial Code (U.C.C.). Section 4–9–102(2), C.R.S. *See also* § 4–8–307, C.R.S. (1987 Cum.Supp.).

The policy of the U.C.C. is to expand creditors remedies with respect to personal property collateral. *Wiley v. Bank of Fountain Valley,* 632 P.2d 282 (Colo.App. 1981). Accordingly, it permits the secured party to take possession as a pledgee, *see* § 4–9–503, C.R.S. (Official comment), and after default without resort to judicial process. Section 4–9–503, C.R.S.

■ Here, the Bank had possession of the stock as pledgee and had the rights and duties of a secured party in possession. Section 4–9–207, C.R.S. Section 4–9–207(2)(c), C.R.S., provides that money received from the collateral, unless remitted to the debtor, shall be applied in reduction of the secured obligation. Therefore, the Bank properly applied the liquidating dividend money to the debt on the note.

■ Furthermore, there was no statute of limitations bar to the Bank satisfying the debt with the collateral or the proceeds realized from the collateral. A pledge is not terminated by the running of the statute of limitations against the claim secured by the pledge. Restatement of Security § 47 (1941). The running of the statute of limitations on the note may cause the remedy on the note to be lost; however, it does not extinguish the debt. *Estate of Ramsey v. State Department of Revenue,* 42 Colo.App. 163, 591 P.2d 591 (1979); *see Van Diest v. Towle,* 116 Colo. 204, 179 P.2d 984 (1947). Since these principles of law were not displaced by the provisions of the U.C.C., they continue to apply to commercial contracts and supplement the U.C.C. Section 4–1–103, C.R.S.

A secured party has the right to satisfy the debt with the collateral either by disposing of the collateral pursuant to § 4–9–504, C.R.S. (1987 Cum.Supp.), or by accepting the collateral, as a discharge of the obligation pursuant to § 4–9–505(2), C.R.S. (1987 Cum.Supp.). There is no statutory time limit within which the creditor is required to dispose of the collateral; instead, the disposition need only be made in a commercially reasonable time. Section 4–9–504, C.R.S. (Official comment 6).

■ Here, it was commercially reasonable for the Bank to continue to hold the stock until the RMB liquidation was completed. Furthermore, the obligors requested the Bank await the conclusion of liquidation proceedings. If the creditor's disposition of the collateral proceeds in the manner requested by the debtor, the debtor is estopped to assert that the creditor has not followed the statutory procedure. 9 R. Anderson, *Uniform Commercial Code* § 9–507:7 (3rd ed. 1985).

### III.

■ Finally, the Bank asserts the trial court erred by denying it the attorney fees incurred in enforcing its rights pursuant to the contract. We disagree.

The Bank does not indicate what contract language it depends on. Award of attorney fees is referred to twice in the contract. The first provision refers to recovery of attorney fees related to the costs incurred while disposing of the collateral

pursuant to § 4-9-504, C.R.S. (1987 Cum. Supp.). The Bank did not proceed under that section. Instead, it applied the liquidation dividend to the secured obligation pursuant to § 4-9-207(2)(c), C.R.S., which does not provide for attorney fees.

The second provision refers to attorney fees related to enforcement of the note. The Bank did not enforce the note in this action because the statute of limitations ran on it. Therefore, it cannot collect attorney fees under this provision.

We reject the Bank's claim for attorney fees premised on its assertion that the plaintiffs' answer on appeal was frivolous.

The portion of the judgment entering an award of $325,106.96 against the Bank is reversed. In all other respects, the judgment is affirmed. The cause is remanded to the trial court for proceedings consistent with this opinion.

STERNBERG and BABCOCK, JJ., concur.