FILED
United States Court of Appeals
Tenth Circuit

October 22, 2012

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

SOLA SALON STUDIOS, INC., a
Colorado limited liability corporation,

      Plaintiff-Counter-Claim-
      Defendant-Appellee,

v.

CECILIA HELLER, as successor trustee
for the David H. Simon 1971 Trust, the
Peter N. Simon 1971 Trust, and the
Michael B. Simon 1971 Trust,

      Defendant-Counter-Claimant-
      Appellant.

No. 11-1103
(D.C. No. 1:08-CV-01565-PAB-BNB)
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE**, Chief Judge, **HOLLOWAY,** and **KELLY**, Circuit Judges.

---

This case arises from various disputes between a landlord and tenant. The landlord

is Ms. Heller, the counterclaimant-appellant herein, and the tenant is Sola Salon Studios,

Inc. ("Sola"), the appellee herein. Only one of the parties' many claims and

counterclaims is before this court. All that is left for our resolution is a determination

---

[*]This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

whether a technical provision of the parties' lease – an anti-assignment provision – was breached by Sola. But what starts out as a simple enough question – did Sola assign an interest in the lease, thus constituting a breach of that provision? – spawns more complex questions.

Sola, which owns and operates a chain of hair salons, entered into license agreements with individual stylists that allowed the stylists to exclusively use individual studio spaces in Sola's salon space, which it rented from Ms. Heller. But these stylists were not employees of Sola, and instead were licensees of Sola's retail space who managed and ran their own salon businesses, leaning on Sola for administrative support. To paraphrase Sola's motto, the stylists are in business *for* themselves, but not *by* themselves. The predominant component of this contractual relationship between Sola and its stylists is that Sola allowed the stylists to use retail space rented by Sola (from Ms. Heller), and as consideration the stylists paid Sola rent on a weekly basis.

Thus, Sola's contracts with its stylists entitle Sola to a meaningful and reliable revenue stream. Sola leveraged this revenue stream by assigning as collateral its rights in these contracts to large banks, which in exchange loaned Sola substantial sums of money. Ms. Heller says that Sola was not allowed to make assignments of this fashion, because the lease prohibited Sola from assigning "any interest" in the lease. Sola responds that the lease did not prohibit assignment of rents resulting from contractual relationships with its stylists that were explicitly contemplated by the parties' lease. Though the dispute is

2

not an easy one to resolve, we ultimately conclude that Sola has the better of the argument, and therefore **AFFIRM** the judgment of the district court.

# I. BACKGROUND

## A. *Factual context.*

Sola Salon owns salon studios throughout the country. But Sola's operational structure is rather unusual. Sola does not employ beauticians or stylists, and instead contracts with those kinds of professionals to use space that Sola leases from someone else, and allows the professionals to operate their own independent salon studios.

In 2004, Sola saw an opportunity to open a new location in the Cherry Creek neighborhood of Denver. Specifically, it identified space in the Fashion Square Plaza ("Fashion Square") which was being marketed as available for lease by the building's owner, 265-269 Detroit, LLC ("Detroit"). After negotiations Sola and Detroit came to an agreement and finalized a lease. The lease contained many boilerplate terms, but also included specially designed provisions that allowed Sola to license to independent stylists the space it was leasing from Detroit. A few months after Sola began occupying its leased space, Detroit discovered that the formal lease agreement did not correctly memorialize all the terms of the deal that the parties had agreed to. The parties had agreed to a "net" lease structure, where Sola would pay its *pro rata* share of the building's management and operation expenses, but the formal agreement reflected a

3

"gross" structure, where Sola's base rent was essentially the *only* amount it was required to pay to the landlord. So the parties signed a lease amendment, modifying the formal lease agreement to reflect a net, rather than gross, lease. The amendment also granted Sola some concessions – for example, it changed the terms upon which Sola could choose to extend the initial lease term in a way that made the terms more favorable to Sola.

Over the next several months Sola was successfully licensing most or all of its studio space to independent stylists. But Detroit put Fashion Square on the market, and David Simon came into the picture as a potential purchaser. At some point it became clear that Mr. Simon would be purchasing the building on behalf of three separate trusts bearing the name of Simon and other family members. The trustee of those three trusts, Ms. Heller, is the Defendant and Counterclaimant in this case and Appellant in this appeal. After extremely contentious negotiations between Mr. Simon and Detroit, Mr. Simon signed a contract to purchase Fashion Square on behalf of the three trusts. The deal was closed, and Ms. Heller stepped into the shoes of Detroit as Sola's landlord.

Ms. Heller became unhappy with Sola's performance as a tenant. Among other things, Ms. Heller interpreted the lease agreement as meaning that Sola was obligated to pay substantially more operating expenses than it had been. Sola disagreed. Sola sued and Ms. Heller countersued, each asserting several claims, all arising out of the parties' performance of the lease agreement. Almost all of the parties' disagreements have been finally resolved. Only the district court's resolution of a single counterclaim is appealed.

4

Ms. Heller, in a counterclaim, argued that Sola breached the lease's anti-assignment provision. The district court disagreed, granting summary judgment in favor of Sola on the counterclaim. Ms. Heller appeals that decision.

### B. Alleged breach of the anti-assignment provision.

As noted, Sola had entered into license agreements with various individual stylists. The purpose of the license agreements was to give stylists the right to conduct their business in an individual salon studio which was part of the premises leased by Sola. The licenses, titled "Studio License Agreements," effected this purpose by granting the stylists "open and unlimited access to the common areas and the [licensed studio(s)] 24 hours a day, seven days a week." But the licenses also gave Sola the right to relocate the stylists to a new studio whenever Sola desired, so long as Sola "maintain[ed] and provide[d] to the [stylist] the approximate same square footage in the new studio as in the [original] [s]tudio." The agreements also gave stylists "the non-exclusive rights to use the common areas leased to Sola . . . , which include the hallways, vestibule, coin-operated laundry and break room, and bathrooms."

Sola desired more operating capital and applied for loans from commercial banks. In December 2006, Sola obtained a loan from Vectra Bank ("Vectra") for a principal amount of $1,500,000. As security for the loan, Sola assigned to Vectra its rights under license agreements with stylists at the Fashion Square premises. The assignment gave

5

Vectra the right to collect the revenue stream produced by those licenses in the event that Sola defaulted on the loan. Vectra or Sola (it is unclear which) sought Ms. Heller's consent to the assignment. Ms. Heller refused to consent, but Vectra did not rescind the loan to Sola.

Sola later obtained a loan from Key Bank ("Key") for a principal amount of $1,525,000 in March 2008.[1] As with the Vectra deal, Sola assigned to Key its rights under the license agreements as security for the loan. Five months later, Sola sought a second loan from Key, this time in the amount of $750,000. Again, Sola assigned to Key its rights in the licenses as collateral. Neither Key nor Sola sought Ms. Heller's consent to these assignments.

On February 25, 2009, after this litigation had commenced, Ms. Heller issued to Sola an addendum to an earlier notice of termination, which alleged that Sola violated the lease's anti-assignment provision. Sola attempted to cure the alleged breach by promptly contacting Key Bank and asking Key to release the assignment of the Fashion Square licenses. A Key official testified that a request to release an assignment of collateral typically takes "one to two weeks" to process. Key ultimately assented to Sola's request and released the assignment. The release was dated March 13, 2009, sixteen days after Sola was notified of its alleged breach.

---

[1] Apparently Sola repaid the Vectra loan when it received the loan from Key.

6

*C. District court proceedings on the alleged breach of the anti-assignment provision.*

Ms. Heller asserted a counterclaim against Sola for breach of contract, claiming that Sola had breached the lease's anti-assignment provisions, found in Paragraphs 17A and 17B. Before trial, Ms. Heller moved for summary judgment on that counterclaim. (Ms. Heller also moved for summary judgment on other counterclaims, but we discuss only the anti-assignment counterclaim, because its resolution is the only matter appealed.) The district court denied Ms. Heller's motion for summary judgment on the counterclaim which alleged breach of the anti-assignment provision. The court held that Paragraph 17B could be read to prohibit only assignments of real property interests in the lease agreement, as Sola argued in opposition to summary judgment, rather than any interest described in, or arising out of, the lease agreement, as Ms. Heller argued in support of her motion for summary judgment. The case, including Ms. Heller's counterclaim, went to trial.

After both parties concluded their presentation of evidence, Sola moved for judgment as a matter of law on Ms. Heller's anti-assignment counterclaim pursuant to Fed. R. Civ. P. 50. The district court granted Sola's Rule 50 motion, concluding that the anti-assignment provision only prohibited assignment of real property interests. The district court ruled that Sola's license agreements with stylists did not convey any interest in real property under Colorado law, and thus were not governed by the anti-assignment provision. The district court alternatively held that even if there was a breach, Sola

7

properly cured it pursuant to the lease's cure provision.

*D. Ms. Heller's appeal.*

Ms. Heller appeals the district court's grant of summary judgment to Sola on the anti-assignment counterclaim. She makes three arguments: (1) the anti-assignment provision prohibited assignment of *any* interest *described* in the lease – not just real property interests; (2) even if the provision only prohibited assignment of real property interests, the license agreements conveyed real property interests to the stylists; and (3) assuming there was a breach, whether it could reasonably have been cured in fifteen days was an issue of fact that should have been left for the jury.

We disagree with Ms. Heller's first two contentions, and conclude that Sola did not breach the lease by assigning its rights in the license agreements to Key. Because we hold that there was no breach, we do not address whether Sola effectively cured the claimed breach.

## II. DISCUSSION

*A. Jurisdiction and standard of review.*

The district court had jurisdiction to hear this contract case between diverse parties pursuant to 28 U.S.C. § 1332.[2] We have jurisdiction to review the district court's final

---

[2] Sola brought suit in Colorado state court, but Ms. Heller removed the action to
(continued...)

8

decision pursuant to 28 U.S.C. § 1291.

We review a district court's grant of a Rule 50 motion *de novo*. *Stewart v. Adolph Coors Co.*, 217 F.3d 1285, 1288 (10th Cir. 2000). "All reasonable inferences are drawn in favor of the nonmoving party[,] and this court does not make credibility determinations or weigh the evidence." *Id.* (quotations omitted). "Judgment as a matter of law is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position." *Id.* (quotations omitted). In cases brought pursuant to diversity jurisdiction, "the substantive law of the forum state" – here, Colorado – "governs the analysis of the underlying claims, including specification of the applicable standards of proof, but federal law controls the ultimate, procedural question whether [judgment as a matter of law] is appropriate." *Wagner v. Live Nation*

---

[2](...continued)
federal court. The removal notice alleges that Ms. Heller has a principal place of business in New Jersey without making any allegations that firmly show her domicile or even her state of residence. As a general rule, when a trust's trustee is a party to litigation, the trustee's citizenship is what matters for diversity jurisdiction purposes. *Ravenswood Investment Co. v. Avalon Correctional Services*, 651 F.3d 1219, 1222, n.1 (10th Cir. 2011). Here, the trustee, Ms. Heller, is an individual whose citizenship for diversity jurisdiction purposes is the state of her domicile; individuals do not have a principal place of business for purposes of diversity of citizenship jurisdiction.

Nevertheless, despite this deficient component of the pleadings, in determining whether the district court had jurisdiction to hear this case, we infer from the allegation that Ms. Heller's principal place of business is in New Jersey that her state of domicile is, likewise, New Jersey. The pleadings allege that Sola is incorporated in Colorado and that its principal place of business is also in Colorado, with the course of this litigation revealing neither allegation as untrue. Thus, the adverse parties in this suit – an individual domiciled in New Jersey and a corporation with only Colorado citizenship – are completely diverse, and the district court therefore had jurisdiction to entertain it.

9

*Motor Sports, Inc.*, 586 F.3d 1237, 1244 (10th Cir. 2009) (quotations omitted).

*B. The pertinent contractual provisions.*

Paragraph 6A of the lease provides:

> The Premises are to be occupied for operation of a salon with individual studios subleased by Tenant to stylists, professionals, and therapits [sic] specializing in beauty or health care services, . . . and for sale of hair care and cosmetics products and related retail products, general office purposes, and for no other purpose without the prior written consent of Landlord.

Paragraph 17A provides:

> Except as hereinafter specifically authorized, Tenant shall not assign this Lease or any interest therein, or sublet all or any part of the Premises, or permit any part of the Premises to be used or occupied by any persons other than Tenant and its employees, by operation of law or otherwise, nor shall Tenant permit any part of the Premises to be used or occupied by any licensee or concessionaire or permit any persons other than Tenant, its employees and invitees, to be upon the Premises.

Paragraph 17B provides:

> Except for specific uses, licenses, and subleases to salon professionals and others as set forth in paragraph 6A of this Lease, Tenant shall not sublet any part of the Premises, nor assign this Lease or any interest therein without the written consent of the Landlord first being obtained, which said consent shall not be unreasonably withheld; provided that [a variety of conditions are satisfied]. . . . .

Sola entered into three separate assignment agreements – one with Vectra Bank, and two with Key Bank. Ms. Heller alleges that each of the agreements resulted in a

10

breach of the lease's anti-assignment provisions, found in Paragraphs 17A and 17B. The

three assignment agreements are nearly identical to one another. For simplicity's sake,

we discuss only the last assignment agreement, between Sola and Key, which is dated

August 1, 2008. We reproduce the most pertinent portions of that assignment agreement:

> WHEREAS, Assignor has entered into and will in the future enter into various Studio License Agreements with individuals or entities (the "Contracts"), wherein and whereby Assignor licenses individual studio spaces within the Leased Premises;

> * * *

> WHEREAS, the Contracts requires [sic] licensees to pay a weekly license fee to Assignor (the "Contract Payments") under the terms set forth in the Contracts.

> * * *

> 1. Assignment[.] Assignor assign to Assignee, as collateral, all of Assignor's rights, title, and interest in and to the Contracts, and also assigns all of its rights, title, and interest in and to any claim, in law or equity, which Assignor may have in connection with or which it might have by virtue of the Contracts. Further, Assignor hereby presently and absolutely grants, conveys and assigns to Assignee all of Assignor's right, title, and interest in and to the Contract Payments and to any claim, in law or equity, which Assignor may have in connection with or which Assignor might have any [sic] virtue of the Contract Payments.

> * * *

> 7. Collection of Payments. It is understood and agreed that so long as there exists no default under the Obligation, there is reserved to Assignor a license to collect the Contract Payments as they become due under the Contracts. Upon the

11

occurrence of an event of default of the Obligation, subject to Assignor's right to cure such default, such license granted to Assignor shall be immediately revoked upon the demand of Assignee[,] and Assignee is hereby empowered to demand that all Contract Payments shall be paid directly to Assignee. If the Contract Payments are required to be made to Assignee, Assignee shall use the Contract Payments to pay the Obligation in full, and the remaining balance, if any, shall be remitted to Assignor by Assignee. . . . . This Assignment is intended to be and is an absolute present assignment from Assignor to Assignee and is not merely the passing of a security interest.

\* \* \*

13. <u>Remedies</u>. Upon or at any time after default hereunder, subject to expiration of any applicable cure period, Assignee, without in any way waiving such default or limiting any other remedy, may, at its sole discretion and option, take any or all of the following actions:

  . . . .

  (c) Either itself or through a receiver, collect the Contract Payments and, to facilitate collection, Assignee may notify licensees under the Contracts to make payments directly to Assignee.

  (d) Assignee shall, as a matter of right . . . to the extent permitted by applicable law, be entitled to have a receiver appointed for Assignor and/or to take charge of all or any portion of the collateral and to exercise all rights of Assignee under this Assignment. . . . .

IV Appx. 795, 796-800.

*C. The district court's ruling.*

The district court ruled on Sola's Rule 50 motion from the bench. The district judge said that his "legal conclusion" was that the licenses granted by Sola Salon were not interests in real property. The judge cited *Radke v. Union Pacific Railroad Co.*, 334 P.2d 1077, 1086 (1959), and *Welsch v. Smith*, 113 P.3d 1284, 1289 (Colo. Ct. App. 2005), as authority for the general rule in Colorado that a license is not an interest in property but rather a personal and "ordinarily revocable privilege" that may be conferred either in writing or by parol. Because the licenses were not interests in the lease, the judge implied, there had been no breach of the lease's prohibition on assignments.

Ms. Heller subsequently made her own Rule 50 motion for judgment as a matter of law, in which she argued, *inter alia*, that the district court erred in granting Sola's Rule 50 motion on the assignment issue. The district court summarily denied the portion of Ms. Heller's motion pertaining to that argument.

### D. Alleged breach of the anti-assignment provisions.

Under Colorado law, a contract provision is ambiguous where it is fairly susceptible to more than one interpretation. *Stewart v. Adolph Coors Co.*, 217 F.3d 1285, 1290 (10th Cir. 2000) (citing *Ad Two, Inc. v. City & County of Denver*, 983 P.2d 128, 130 (Colo. Ct. App. 1999)). Ms. Heller argues that the relevant provisions of the Fashion Square lease are ambiguous as to what kinds of assignments are prohibited. Specifically, she contends that a reasonable jury could interpret the phrase "Tenant shall not . . . assign

13

this Lease or any interest therein" to "bar an assignment of any interests described in the lease, including interests other than [real] property interests." Aplt. Br. at 21. We disagree.

It is true that the words "any interest" might, on their own, reasonably be read as covering all privileges contemplated by and deriving from the lease. But those words do not appear on their own. The phrase "any interest" is modified by the word "therein," which refers to "in this Lease." A lease is a conveyance of real property. Black's Law Dictionary 970 (defining a lease as "[a] contract by which a rightful possessor of real property *conveys* the right to use and occupy the property in exchange for consideration, usu[ally] rent"). A "conveyance," in the property context, is "[t]he voluntary transfer of . . . property." *Id.* at 383. An "interest" in a lease is, therefore, an interest in real property that has been transferred by the lessor. The provision at issue can only be reasonably read to prohibit transfers (by sublease or assignment) of all or part of the *real property* interest that Ms. Heller conveyed (*i.e.* transferred) to Sola.

With that in mind, we must consider whether Sola assigned to the banks a real property interest in the leased property. Ms. Heller parses the text of Sola's license agreements, arguing that they look much more like transfers of real property than revocable grants of a privilege to use the leased property from time to time. On its face, this might be a reasonable construction of the license agreements. But it does not matter what Sola gave to the *stylists* in the license agreements; what matters is what Sola

14

assigned to the *banks* in the assignment agreements. And the economic reality of the assignments is that the assignment agreements amount to no more than an allowance for the banks to collect rents owed under the licenses. Most importantly, the assignments do *not* constitute a conveyance of real property.

The Colorado Supreme Court has distinguished between a license and a lease, stating that "[a] license in respect to real property is . . . a personal and unassignable, and ordinarily revocable, privilege conferred either in writing or by parol, to do one or more acts on land without possessing any interest therein." *Radke v. Union Pac. R. Co.*, 334 P.2d 1077, 1086-87 (1959) (quotations omitted). "[W]hether the words used [in a contract] create a lease or a license depends upon the agreement itself." *Id.* at 1087. "A license is merely a permit or privilege to do what otherwise would be unlawful." *Id.* "While [a license] has been regarded, for some purposes, as a valuable property right, strictly speaking it is not property or a property right, nor does it create a vested right." *Id.*

The rights Sola assigned to the banks were Sola's rights in the weekly license fees owed by the stylists. The only effect of the assignments was to allow the banks to step into Sola's shoes in collecting rents from the stylists. So we need not determine whether the license agreements themselves constituted grants of an interest in real property to stylists. Even assuming *arguendo* that the licenses were essentially subleases that granted stylists a real property interest in the leased property, the only thing Sola assigned to the

15

banks was its right to collect rents from the subtenant – not any real property right in the lease. A right to collect money owed by one to another is not an interest in real property. The assignment gave the banks *no* rights in the real property underlying the rent payments, as the assignment agreements did *not* call for the banks to step into Sola's shoes as a tenant of the lease under *any* circumstances – even if Sola failed to meet its obligation to repay the bank loan.

To illustrate why the assignments did not transfer a real property interest, let us consider what they allowed the assignees – the commercial banks – to do in the event of a default by Sola on their bank loan repayments. Or, more accurately, what they do *not* allow the banks to do. Suppose one of the banks found stylists willing to pay ten times more for an individual studio than the stylists currently pay under the contract with Sola. Even if the assignment gave the bank the right to deliberately breach the contract with the current licensee, the bank would have *no* right to re-let the studio space to the stylists the bank had found. Moreover, the bank could not terminate the contracts of the current stylists and take over the studio spaces itself.

The license contracts gave Sola some rights (most notably the right to receive rent payments) and gave stylists some rights (most notably the right to perform professional styling services on some of Sola's leased property). Sola's assignment to the bank only assigned away *Sola's* rights under the contracts, and Sola had no real property interest rights under the contracts. Sola's real property rights came from the lease with Ms.

16

Heller, and Sola did *not* assign away any of its rights as a tenant under that lease. If the licensees – the stylists – had assigned away *their* rights to the banks, it might be a different story. In that instance, the banks would be able to step into the stylists' shoes and use the salon space. This might well constitute a transfer of an interest in real property to the banks prohibited by Sola's lease with Ms. Heller. But as we have just said, in the assignments Sola gave away only its rights under the licenses, which did *not* include the right to occupy real property.

*Great-West Life Assurance Co. v. Raintree Inn*, 837 P.2d 267 (Colo. App. 1992), further illuminates the distinction between an assignment of rents and a grant of a real property interest. In that case, a hotel property was encumbered by an amalgamation of security instruments, which included an assignment of rents and a deed of trust granting a lien on the real property. The plaintiff, the secured party, sought to recover, pursuant to the security instruments, revenues generated from the hotel's operations. The defendants, who operated the encumbered hotel, argued that revenues from the hotel business were personal property that was not covered by either of the security instruments. They argued that the deed of trust was an interest in real property, and the assignment of rents only included revenues "incident to the creation of an interest in realty under a deed of trust." The court ultimately held that the assignment of rents in that case "gave plaintiff a right to virtually all of the income streams flowing from use of the defendants' property, not just income attributable to an interest in the real estate itself." Thus, the assignment

17

"indicated that the . . . parties to the assignment . . . had the intent to grant not only a lien upon the real estate, but also an interest in revenue flowing from room rentals."  837 P.2d at 271.

Inherent in the *Great-West Life Assurance* decision is recognition that transfer of an interest in income derived from real property is personal property, and separate from the real property itself.  The court in that case ruled in favor of the plaintiff secured party because the language in the relevant security instruments was expansive enough to encompass *more* than just the real property from which the hotel revenues were derived. Applying this principle to the present case, Sola's assignment of rents deriving from real property is not the same as granting the banks a lien on the real property itself, supporting our conclusion that the assignment did not constitute a conveyance of a real property interest in the leased premises.

### III. CONCLUSION

In sum: The lease only prohibited Sola from assigning away some or all of the real property interest that it held by virtue of the lease with Ms. Heller.  We assume, without deciding, that Sola's license contracts with stylists constituted a transfer of some of the real property interests.  Sola's assignment to commercial banks of its own interests in those license contracts did not breach the lease, because Sola did not transfer to the banks any interest in real property.  Instead, the assignment just conveyed personal property.

Accordingly, Sola did not breach the lease's anti-assignment provisions.

We **AFFIRM** the district court's grant of Sola's Rule 50 motion. Specifically, we agree with its decision that Sola did not breach the lease by assigning its rights under license agreements with individual stylists. Because there was no breach as a matter of law, Sola had no duty to cure, and we therefore do not address the district court's alternative ruling regarding the adequacy of Sola's attempted cure.

ENTERED FOR THE COURT


William J. Holloway, Jr.
Circuit Judge